UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

KEVIN BARNES,
                        Plaintiff,

            - against -

CARSON BLOCK and MUDDY WATERS, LLC,
                     Defendants.

Case No.: 22-cv-7236 (VSB)(RWL)

COMPLAINT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

For his complaint, Plaintiff Kevin Barnes, by his counsel of Slarskey LLC, makes the following allegations and seeks the following relief, against defendants Carson Block and Muddy Waters, LLC (collectively "Defendants"):

1.      This dispute arises out of Carson Block's and Muddy Waters's usurping an investment report of primary research and analysis drafted by Plaintiff Kevin Barnes. Mr. Block surreptitiously leveraged the report to obtain a $14 million whistleblower award from the Securities & Exchange Commission ("SEC") while simultaneously frustrating Mr. Barnes' co-claimant application.

2.      In early-2011, Mr. Barnes and Mr. Block began collaborating on a series of research projects concerning inflated stock prices of US-listed companies based in the People's Republic of China. The two believed that Wall Street's obsession with Chinese companies was unsustainable, and that because of sub-par gatekeeping in the United States securities filings, the stock prices for these companies' prices were effectively being buoyed by information that was false or misleading.

3.      Pursuant to the partnership, Mr. Barnes, a seasoned ex-JPMorgan financial professional with extensive contrarian investment experience, would provide the research and analysis, and Mr. Block, an investor aspiring for publicity as a television personality and podcaster, would be the public face for the content. Mr. Barnes was amenable to staying out of

the spotlight because, in part, he had previously been targeted with frivolous litigation by another Chinese-based company for having drafted a similar report exposing financial malfeasance.

4.      In October 2011, pursuant to the partnership, Mr. Barnes travelled to Asia to conduct rigorous due diligence into Focus Media Holding Corporation ("Focus Media"), which the two believed to be the next great fraud emanating from China. Mr. Barnes pored over thousands of pages of Chinese records and securities filings, and unveiled a web of impropriety by Focus Media and its ex-Chairman, Jason Jiang, surrounding Focus Media's structuring of transactions within Focus Media's wholly-owned subsidiary "Allyes."

5.      Mr. Barnes was the principal author of the 80-page report documenting that Focus Media had engaged in pervasive fraud and that the US-traded Focus Media stock was not worth $25.50 per share, but rather a fraction thereof. On November 21, Mr. Barnes and Mr. Block published the final report, "FMCN: The Olympus of China," on the internet, via Twitter, and through an email push system to Wall Street investors, the SEC, and financial media.

6.      After the SEC became aware of the FMCN Report, it promptly opened an investigation on Focus Media. Ultimately, in 2015, the SEC announced that it had entered into a $55.6 million settlement with Focus Media and Jiang. In connection with the announcement, the SEC notified the public that those who believed they might qualify as "whistleblowers" could submit applications for a whistleblower award.

7.      When Mr. Barnes and Mr. Block began their partnership in 2011, the SEC whistleblower program was in its infancy, and it was unknown if short reports would be eligible for an award. Moreover, the SEC whistleblower award application process was extremely convoluted for anyone other than a former SEC staff attorney responsible for drafting the program rules. At that time, Mr. Barnes and Mr. Block had no designs on an SEC whistleblower

award. It was not until years later that they became sensitized to the opportunity presented by the SEC.

8.     In approximately January 2016, Mr. Block and Mr. Barnes each submitted a whistleblower application to the SEC's Office of the Whistleblower. Mr. Barnes did not appreciate at the time that Mr. Block, for the purpose of attempting to usurp any award entirely for himself, had begun secretly to undermine Mr. Barnes' contributions to the report and role in delivering the report to the SEC.

9.     In 2019, the SEC's Claims Review Staff issued a Preliminary Determination, denying both Mr. Barnes' and Mr. Block's applications, finding that neither qualified as a whistleblower because a mass publication of a report does not constitute a "tip" under the law. Both contested the Preliminary Determination through the SEC's internal process. By that point, Mr. Block was not responding to Mr. Barnes' communications.

10.    In March 2022, the SEC issued a Final Order mysteriously denying Mr. Barnes' application, but, with respect to Mr. Block, overruling its own Claims Review Staff's Preliminary Determination. The SEC's Final Order affirmed the prior determination that Mr. Block did not fulfill the technical requirements to be deemed a "whistleblower," but exercised the SEC's equitable "discretionary" power to waive the requirements for Mr. Block. The SEC awarded Mr. Block 100% of a $14 million allotment set aside for the whistleblower awards in this matter.

11.    Upon information and belief, contrary to Mr. Block's prior express representations to Mr. Barnes that he had informed the SEC of Mr. Barnes' role in the creation and publication of the report, Mr. Block had instead diminished, or failed to disclose altogether, Barnes' role in communications with the SEC.

12.     Ultimately, Mr. Block obtained a $14 million windfall as a result of Mr. Barnes' research and Mr. Block' strategic undermining of Mr. Barnes' standing before the SEC and opportunity to share in those proceeds. Mr. Block may not retain the benefit of a $14 million award when he engaged in a series of unscrupulous tactics to ensure that Mr. Barnes would not share in the proceeds.

## PARTIES

13.     Plaintiff Kevin Barnes ("Mr. Barnes") is a natural person residing in the Commonwealth of Pennsylvania.

14.     Defendant Carson Block ("Mr. Block") is a natural person residing in Austin, Texas.

15.     Defendant Muddy Waters, LLC ("Muddy Waters") is a limited liability company organized under the laws of the State of Nevada. Upon information and belief, its sole member is Mr. Block, a resident of the State of Texas. Muddy Waters' principal place of business is Austin, Texas.

## JURISDICTION AND VENUE

16.     The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(2) because Mr. Barnes is citizen of Pennsylvania, and because Defendants are all citizens of foreign states.

17.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) and (3) because the Parties first met in person and formed their relationship in New York, and subsequently met concerning the subject matter of this action in New York.

## FACTUAL ALLEGATIONS

### A.  Background of Mr. Barnes

18.     Plaintiff Kevin Barnes is an experienced financial analyst and securities trader. Mr. Barnes received his undergraduate degree from Cornell University and began his career at JPMorgan's Investment Banking division in 2003.

19.     Mr. Barnes is particularly interested in esoteric investment opportunities, *i.e.*, event-driven and activist research and investments, including opportunities. Mr. Barnes' core strategy often includes identifying off-the-beaten-path opportunities which may be mispriced based on an impending catalyst not obvious to the average investor, and which could dramatically alter the securities price of a company.[1]

20.     To execute on his investments, Mr. Barnes frequently expends considerable time, resources, and hard costs (such as travel, investigative costs, and expert fees) to uncover little-known facts concerning publicly-traded companies and carefully document his research hypotheses.

21.     Mr. Barnes has a particular expertise in pulling hard-to-identify filings made by publicly-traded companies to domestic and international regulatory bodies, which could provide valuable nuggets of information which the general investment public might not yet appreciate.

22.     If Mr. Barnes' hypothesis that the entity is ripe for a material adverse event becomes true, and the market dramatically changes its view of the company, the stock price may plummet. Of the 17 arbitrageurs analyzed in the research sample set by Ljungqvist et

---

[1]  *See* Ljungqvist, Alexander and Qian, Wenlan, "How Constraining are Limits to Arbitrage? Evidence from a Recent Financial Innovation" (January 2014). NBER Working Paper No. w19834, pages 9-10.  Available at SSRN: *https://ssrn.com/abstract=2384293*.

al, Mr. Barnes' entity Absaroka Capital Management LLC ("Absaroka") had the second highest return generation over three months of 51.8%.[2]

23.     As of 2011, Mr. Barnes became focused largely on arbitrage opportunities concerning stocks listed on US stock exchanges with operations in the People's Republic of China. Mr. Barnes sensed that many North American investors had, at the time, become overly and unduly bullish on particularly small and mid-sized Chinese companies without much understanding of the actual operational health of those companies.

24.     More specifically, he believed that several Chinese companies had cut corners on their regulatory reporting, such that buried in filings required for North American-listed publicly-traded companies were material misstatements that, if uncovered, would dramatically alter the market's perception of intrinsic value of the stock compared to the trading price.

25.     In 2010 and 2011, through his entity Absaroka, Mr. Barnes conducted several investigations into China-based, US-listed companies, uncovering material misstatements by a number of such companies. He documented his research in several written reports, which he disbursed to a select community of investors, regulators, and press reporters.

**B.  Mr. Barnes' Introduction to Mr. Block and Muddy Waters, LLC**

26.     In early-2011, Mr. Barnes was introduced by a third-party to defendant Carson Block. Just a few months earlier, Mr. Block had created a shell entity, defendant Muddy Waters, LLC to pursue similar event-driven investment research as Mr. Barnes covered. Upon information and belief, at the time, Muddy Waters was not an SEC-registered investment advisor, and did not have any permanent capital or full-time employees outside of Mr. Block.

---

[2] Under the same metric, Mr. Block's Muddy Waters return generation was only 4.8% (13th out of 17 sample).

27.     Upon information and belief, the idea behind Muddy Waters was to promote investment research announcing contrarian research analysis and Muddy Waters's short-selling stock position. Prior to Muddy Waters's publicizing the negative commentary on a subject company, Mr. Block[3] also takes a short position in the stock, thus potentially earning investment gains.

28.     Both Mr. Barnes and Mr. Block were particularly interested in opportunities to promote research concerning and/or take short-selling positions in Chinese companies. Both viewed the market prices of Chinese companies to be over-inflated and significantly higher than the true intrinsic stock value of certain companies.

29.     By contrast to Mr. Barnes, however, Mr. Block had limited institutional investment or research experience. Mr. Block had previously suffered a tumultuous career, including operating a self-storage business and a one-year run practicing as a law clerk in Asia. Mr. Block acknowledged that he was not a proficient financial analyst, particularly in Wall Street-style investment analytics, and would require someone like Mr. Barnes, a skilled writer with experience at a bulge-bracket investment bank, to support the image Mr. Block hoped to create for himself.

30.     Whereas Mr. Barnes was simply interested in diligently conducting financial research, publishing well-grounded and well-written reports, and effectively trading securities, Mr. Block's overarching goal was to develop a recognizable, public-facing Jim-Cramer-like public persona. Central to Mr. Block's strategy was engagement of public relations personnel to hyper-aggressively land television speaking opportunities and to insert himself into

---

[3] Personally or through subsequent entity Muddy Waters Capital, LLC.

dubious of investment commentaries, which could gain Mr. Block notoriety in the investment world.

31.     Thus, there was seemingly a synergy between Mr. Barnes and Mr. Block: Mr. Block wanted to be public-facing, but lacked the financial analytics expertise or pipeline of investment hypotheses requiring the skills of someone like Mr. Barnes; and Mr. Barnes wished to focus on channeling his investment strategies but, unlike Mr. Block, did not desire unnecessary public attention.

32.     Accordingly, throughout 2011, the two collaborated on a number of projects.

33.     Mr. Barnes conducted research on China Shen Zhou Mining & Resources, Inc. ("SHZ"), a Chinese purportedly engaged in fluorite production. Mr. Barnes believed SHZ was fraudulently misrepresenting its business in securities filings, and thus the New York common stock trading price was significantly higher than SHZ's true intrinsic value.

34.     Mr. Barnes managed all associated research, including retaining third-party interpreters and document translators to complete channel checks, gather various research materials concerning SHZ's end-markets, and expended significant time preparing the research report he authored for publication.

35.     Mr. Barnes provided a final draft of the SHZ report to Mr. Block prior to publicly disbursing it, and Mr. Block made only some minor suggested typographical and stylistic edits in response. Mr. Barnes permitted Mr. Block, via Muddy Waters, to establish a short-selling position in the SHZ stock.

36.     On March 8, 2011, Mr. Barnes published his SHZ report, entitled "China Shen Zhou Mining & Resources: Yet Another Massively Over-Valued Chinese Reverse Merger." The same day, the verified @MuddyWatersRe Twitter account, controlled by Mr.

Block, tweeted, "*Absaroka just released a solid report on a Chinese reverse-merger disaster*," along with a hyperlink to the entire report, and also announced "*MW is short SHZ based on the Absaroka report*." The SHZ share price dropped approximately 7% upon publication of the report and was company ultimately de-listed altogether, resulting in a healthy profit to Muddy Waters and Mr. Block.

37.     On April 13, 2011, Mr. Barnes and Mr. Block met for the first time in person over breakfast in Manhattan. The two discussed additional ways to increase the partnership, which they ultimately did. Having seen the quality of Mr. Barnes' research skills and work product, Mr. Block began courting Mr. Barnes more aggressively.

38.     Mr. Block followed up consistently after their meeting to discuss additional ways to collaborate and requested that Mr. Barnes fly to Hong Kong to meet again. Per Mr. Block's request, Mr. Barnes flew to Hong Kong that month to meet with Mr. Block and to brainstorm additional projects and structures the two could explore.

39.     Over the next few months, Mr. Barnes and Mr. Block successfully collaborated on several additional projects, including research of a Chinese silver firm from July to September 2011 and of a global firm with significant operations within the People's Republic of China in August and September 2011. As part of their partnership, the two also conducted research which was never published.

40.     Thus, Mr. Block and Defendants operated as partners: Mr. Barnes would research and publish high quality research, with Mr. Barnes and Defendants alternating as to who would incur the cost of a particular report; they would then publish the research; and each traded the stock at its independent risk. Though Defendants did not sell the reports to a third-party, the parties had agreed that, if that were to occur, they would share in the net revenues from such transaction.

41.     Mr. Block invariably and repeatedly praised Mr. Barnes work and the results he had generated for their partnership.

**C.  The Parties Extend the Partnership to Focus Media**

42.     In September 2011, Mr. Block contacted Mr. Barnes to schedule an in-person meeting in New York concerning a new investment idea, Focus Media Holding Company, Inc. ("Focus Media"). Focus Media was, at the time, a Chinese advertising company listed on the Nasdaq exchange with a $3.4 billion market capitalization.

43.     On September 14, 2011, Mr. Barnes and Block met in person at the Intercontinental New York Barclays hotel in Manhattan. The two spent over an hour discussing the Focus Media opportunity and partnership structure.

44.     At the time, Mr. Block suspected that Focus Media and its chief executive Jason Jiang, had mispresented the business to United States investors through its securities filing. If he, or Mr. Barnes, were able to publish a report indicating that the market's assumptions behind Focus Media's financial health were unreliable, then the stock price would tumble, and short-sellers could profit from that dislocation. Mr. Block and Muddy Water, however, lacked the research and financial analytics bandwidth to demonstrate his suspicions, and thus required the expertise of Mr. Barnes to successfully execute the project.

45.     At the September 14 meeting, the two hashed out the terms of an oral partnership agreement framework to pursue research on Focus Media and another publicly-traded company with significant operations within China.

46.     Pursuant to the partnership agreement and similar to the parties' prior collaborations, Mr. Barnes would provide research and financial analysis concerning the Focus Media opportunity and Mr. Block, through Muddy Waters, would publicize the findings. As before, each of Mr. Barnes, on the one hand, and Mr. Block/Muddy Waters, on the other, would

be permitted to trade (short) the stock at his/its own risk and, if the report generated revenue, the parties would share in those proceeds.

47.     The parties agreed that Mr. Barnes would conduct an in-depth analysis into Focus Media and Jiang, including Mr. Barnes' retrieving and reviewing difficult-to-identify, dense regulatory filings and, ultimately, Mr. Barnes' travelling to Asia to conduct in-person investigation into potential fraud and misconduct by the subjects.

48.     Though the partnership envisioned operations much like the parties had done previously, at the September 14 meeting, unlike earlier opportunities, Mr. Block insisted that the research be published under the "Muddy Waters" brand and not, as previously, under Mr. Barnes' entity. This, Mr. Block explained, was part of Mr. Block's and Muddy Waters' efforts to be the public face of all investment opportunities associated with Block. Mr. Barnes agreed to Defendants' condition.

49.     Projecting personal safety concerns arising out of a potentially dangerous investigation in the People's Republic of China, Mr. Block also insisted upon various measures to create the cloak of confidentiality and anonymity as Mr. Barnes and Mr. Block pursued the opportunity. Mr. Block required that the two refer to the Focus Media opportunity as "Project PHOENIX," and Mr. Block would utilize the pseudonym "Carter Miller" in most electronic communications.

50.     Mr. Block insisted that Mr. Barnes, and anyone else involved on Project Phoenix, communicate covertly on Kimpax.com, an encrypted email and cloud infrastructure of which Mr. Block was the host. As part of the partnership, Mr. Barnes was provided access to Mr. Block's Kimpax.com service, which held material communications concerning the parties'

partnership and Mr. Barnes' work products.[4] Mr. Barnes operated with the pseudonym "Erik Hansen" as per Mr. Block's request.

51.     At the end of the September 14 meeting, Mr. Barnes and Mr. Block shook hands on the partnership. They expressly used the term "partnership" and have never deviated from that designation. Over the next week, Mr. Barnes and Block communicated numerous times over telephone to finalize logistical planning for the projects.

### D.  Mr. Barnes Researches the Focus Media Opportunity, at Considerable Security and Physical Safety Concerns to Mr. Barnes

52.     Following Mr. Barnes' September meeting with Mr. Block, Mr. Barnes immediately began conducting detailed due diligence on Focus Media. Even prior to Mr. Barnes' leaving for Asia for the full-blown investigation, Mr. Barnes began pulling information from publicly available sources, reviewing those documents, and outlining potential report themes.

53.     Mr. Barnes populated an electronic data-room within Kimpax.com with publicly available background materials related to Focus Media. These source documents were footnoted extensively in the final report, discussed below.

54.     To fully appreciate and investigate Focus Media and Jiang, however, Mr. Barnes traveled to Asia to oversee the retrieval of documents not easily obtained within the United States, *e.g.,* physical documents filed with the State Administration for Industry Commerce in China ("SAIC"), and to dialogue with people familiar with Focus Media or Jiang.

55.     Accordingly, on October 10, 2011, Mr. Barnes travelled to Bangkok, Thailand, to begin his and Mr. Block's in-person collaboration on the Focus Media project.

56.     In Bangkok, the two were joined by Mrs. Kathy Block (Mr. Block's wife) and three Chinese nationals Muddy Waters retained, on a contract basis, to assist with the in-

---

[4] Mr. Block cut off Mr. Barnes' access to the Kimpax account years ago.

country document retrieval. Unlike the document translators, interpreters, and investigators Mr. Barnes had utilized on prior projects, these contractors had limited English composition skills, no prior United States financial markets analysis experience, and had never published a successful short activism report.

57.     Within the first week of being in Bangkok, Mr. Barnes identified the critical Focus Media "Allyes" transactions as being potentially problematic. Specifically, Mr. Barnes determined Focus Media had inaccurate SEC disclosures regarding a partial sale of the Allyes subsidiary to insiders, including Chairman Jiang. Through a deep review of SEC filings, corporate registry document, and translated versions of SAIC filing, Mr. Barnes was able to determine that Allyes had, in fact, divested much of its assets to insiders in a series of self-dealing transactions. Mr. Barnes quickly shifted all his attention to this lead and instructed the Mandarin language interpreters to retrieve additional source documents and corporate registry filings from the People's Republic of China.[5]

58.     Mr. Barnes (and Mr. Block) faced substantial and unique safety and security concerns while in Asia. As a result of Mr. Barnes' and Mr. Block's history of investigating Chinese-based companies, *they* became the targeted. While in Thailand, Mr. Barnes faced an apparent cyberattack that repeatedly locked him out of his personal email and social media account. Just weeks earlier, attorney that had been retained for another of Mr. Barnes' China-focused investments was credibly threatened with serious physical violence after supporting Mr. Barnes' collection of similar SAIC filings in China, and Mr. Barnes operated in constant concern for his own personal safety.

---

[5] Mr. Barnes also dropped another opportunity that he and Mr. Block had been pursuing together in favor of the Focus Media investigation.

59.     Mr. Barnes, Mr. Block, and Mrs. Block spent approximately one month in Thailand. Throughout, Mr. Barnes enjoyed a collegial relationship with Mrs. Block as well as the three Chinese national contractors the parties had retained.

60.     As a result of flooding in Thailand and impending visa expirations, on November 9, 2011, Mr. Barnes, the Blocks, and one of the contractors returned to the United States to continue the work on Focus Media. Mr. Barnes spent the next few weeks working from the Block's condominium in order to finalize the report the parties intended to publish.

**E.  Mr. Barnes and Mrs. Block Publish the Report, Send the FMCN Report to the SEC, and Share as Partners**

61.     On November 20, 2011, Mr. Barnes finalized the report that he had been drafting for weeks. The final report, entitled "FMCN: The Olympus of China" (the "FMCN Report") is an 80-page document, containing detailed findings, written by Mr. Barnes, concerning fraudulent accounting, insider transactions, and other corporate malfeasance. The FMCN Report was meticulously researched and supported with 111 footnotes to source documents, which were mostly gathered by Mr. Barnes. Ultimately, the FMCN Report concludes that the Focus Media $25.50 stock price was grossly overpriced compared to its true intrinsic value.

62.     On the morning of November 21, 2021, Mr. Barnes and Mrs. Block sat at the kitchen table of the Block residence and prepared the FMCN Report for circulation to the public.

63.     Mr. Barnes and Mrs. Block prepared an email distribution for the FMCN Report, using an email push service called "iContact." The two uploaded the FMCN Report hyperlink to iContact, drafted bullet-points summarizing the FMCN Report which would be

included in the cover email, and finalized the listserv names of intended recipients to the software.

64.     Importantly, Mr. Barnes and Mr. Block had expressly agreed to the iContact circulation list for the FMCN Report. The listserv included those people Mr. Barnes and the Blocks believed would be interested in the FMCN Report's exposure of significant irregularities, including investors, news media, and financial regulators. By circulating the FMCN Report to several email accounts associated with attorneys at the SEC, Mr. Barnes and Mr. Block specifically endeavored to tip the SEC that they believed Focus Media and Chairman Jiang should be investigated for defrauding United States investors.

65.     At approximately 12:30pm EST, Mr. Barnes and Mrs. Block clicked "Send" on the iContact email push notification. Mr. Block did not directly participate in the creation or the sending of the iContact email push notification.

66.     One minute later, at 12:31pm EST, Mr. Barnes and Mr. Block tweeted via the @MuddyWatersRe a Twitter-post the two had created introducing the FMCN Report and sharing a hyperlink to the entire report. That tweet was disbursed to the approximately 80,000 followers of the account from which it was tweeted and also to public viewers of the account.

67.     Mr. Barnes and Mrs. Block also coordinated a grass-roots media outreach campaign to ensure that major public media outlets learned of the FMCN Report. As result of Mr. Barnes and Mrs. Block's outreach, the Financial Times, Reuters, The Wall Street Journal, Bloomberg, and The New York Times all wrote articles concerning the FMCN Report.

68.     In addition, Mr. Block had marketed research pertaining to Focus Media to an third-party investment fund. Consistent with Mr. Barnes' and Mr. Block's partnership agreement, Mr. Block remitted Mr. Barnes his share of the net revenue, after total project expenses, from that sale.

69.     Within hours of the release of the FMCN Report, shares of Focus Media plunged as much as 66% intraday. The stock dropped from over $25.50 per share to $15.43 per share, implying a single day $1.3 billion decrease in market capitalization. The market and media lauded the FMCN Report for its depth of investigation.

**F.   The FMCN Report Triggers an SEC Investigation**

70.     On approximately November 29, 2011, the two further discussed the market's reaction to the FMCN Report and the possibility of regulatory action. In the months following their release of the FMCN Report, Mr. Barnes and Mr. Block remained in close contact, with the two continuing to collaborate including on China-oriented projects in late-2011 and early-2012.

71.     In December 2011, the SEC opened a "Matter Under Inquiry" concerning Focus Media and Jiang. The SEC has subsequently stated that it opened the inquiry as a result of one SEC's attorney's discovery of FMCN Report through public sources on the internet, and *not* as a result of anyone's sending the FMCN Report to the SEC directly. At the time, the "Matter of Under Inquiry" was not widely publicized.

72.     Soon thereafter, Mr. Barnes and Mr. Block spoke telephonically, and Mr. Block divulged that the SEC had contacted Muddy Waters to discuss the findings in the FMCN Report. Upon information and belief, Mr. Block used his personal interactions with the SEC to devalue Mr. Barnes' contribution to the partnership and research.

73.     Mr. Block informed Mr. Barnes that Muddy Waters had retained counsel and that Muddy Waters had re-provided the SEC the FMCN Report and the source materials which Mr. Barnes and Mr. Block had already made available on the internet.

74.     Mr. Barnes specifically inquired whether he should personally get involved in the communications with the SEC. Mr. Block expressly assured Mr. Barnes that the

SEC was aware that Mr. Barnes was an author of the report and had received copies' of Mr. Barnes' work-product retained on the Kimpax.com server.

75.     The parties specifically discussed that, consistent with the parties' partnership agreement, specifically that Mr. Block would be public-facing and Mr. Barnes would remain behind-the-scenes, that Muddy Waters—and *not* Mr. Barnes—would interface with the SEC.

76.     In reliance on Block's representation that the SEC was well-aware that Mr. Barnes was the author of the FMCN Report, Mr. Barnes did not find it necessary to affirmatively interface with the SEC.[6]

77.     In September 2012, Mr. Barnes informed Block that he would be taking a full-time position with a SEC-registered investment advisor. Mr. Block congratulated Mr. Barnes on the new opportunity and subsequently met him for coffee in Manhattan to discuss further updates on the Focus Media situation.

78.     Mr. Barnes and Mr. Block nevertheless remained in cordial contact concerning the SEC's investigation on Focus Media and other developments regarding Chinese equities.

## G.  The SEC Announces Settlement with Focus Media and Jiang, and Announces its Acceptance of Whistleblower Applications

79.     On September 30, 2015, the SEC released a Notice of Covered Action announcing that the SEC had successfully entered into a settlement with Focus Media and Jiang in the amount of approximately $55.6 million. *See* Notice of Covered Action 2015-111, *In the*

---

[6] For the avoidance of doubt, had the SEC subpoenaed or otherwise demanded that Mr. Barnes communicate with them, he would have willingly done so.

*Matter of Focus Media Holding Limited and Jason Jiang*, Admin. Pro. File No. 3-16852, Rel.

Nos. 33-9933 and 34-76030 (Sept. 30, 2015).

80.     The Notice of Covered Action explains that the basis for the settlement

were the allegations that Focus Media and Jiang had made public misrepresentations, and

specifically focused on the Allyses transactions, first reported by Mr. Barnes in the FMCN

Report. As the SEC later put it, Mr. Barnes' work "*was credible and of high quality and caused

the [SEC] Enforcement staff to open an investigation that ultimately resulted in the successful

Covered Action and returned millions of dollars to harmed investors*."

81.     Simultaneous with the posting of the Notice of Covered Action, the SEC

announced that it would accept applications from those people who believed that they provided

material information to the SEC and could otherwise support a whistleblower award.

82.     As background, in the wake of the 2008 financial crisis, Congress enacted,

as part of the Dodd-Franck Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), a

whistleblower regime. Pursuant to the whistleblower program, natural person may submit a tip,

complaint, or referral to the SEC's Office of the Whistleblower, and, if the SEC successfully

recovers from the company or person which is the subject of the information, and if the SEC

deems the tip, complaint, or referral to have caused the recovery, then the whistleblower is

potentially eligible to collect a portion (10-30%) of the SEC's recovery.

83.     The SEC promulgated rules (the "SEC Whistleblower Rules"), effective

August 12, 2011, setting forth its internal administrative process for collecting and reviewing

whistleblower applications. *See* Securities Whistleblower Incentives and Protections, 76 Fed.

Reg. 34,300 (codified at 17 C.F.R. § 240.21F-1, *et. seq.*).

84.     Thus, the SEC's whistleblower program and the surrounding rules were at

their infancy at the time Mr. Barnes and Mr. Block originally published the FMCN Report—

having been enacted just weeks before the publication of the report and before the SEC had announced any precedent whistleblower awards.

85.     Following the SEC's settlement announcement, Mr. Barnes immediately contacted Block via email to celebrate their joint publication and its leading to a successful $55.6 million settlement between the SEC and Focus Media/Jiang.

86.     Mr. Barnes informed Mr. Block of the possibility that, even though they submitted the FMCN Report much earlier, the SEC nevertheless appeared amenable to accepting whistleblower applications. Mr. Barnes told Mr. Block that whistleblower "pay-outs can be up to 30% of the funds collected."

87.     Mr. Block responded, "I'll look at whether it's potentially eligible." Mr. Barnes believed at the time that Mr. Block was researching on behalf of the both of them.

88.     The next day, Mr. Barnes followed up with his initial research concerning the potential for a whistleblower award, including detailed empirical data concerning historical payouts pursuant to the SEC's whistleblower program. Mr. Barnes advised Mr. Block that, in order to be potentially eligible, the applicant would need to submit an SEC "Form WB-APP" to the SEC's Office of the Whistleblower within ninety (90) days. Mr. Barnes suggested that the parties engage "specialized whistleblower counsel" to help navigate process. At the time, Mr. Barnes was operating under the assumption that Muddy Waters would submit an application as the agent of Mr. Barnes.

89.     Weeks passed without communication from Mr. Block, despite Mr. Barnes's numerous efforts to contact Mr. Block. Mr. Barnes did not know that, at the time, Mr. Block was quietly plotting to usurp the FMCN Report for his sole benefit to the exclusion of Mr. Barnes.

90.     On January 18, 2016, having not heard back from Mr. Block, Mr. Barnes followed up to remind Mr. Block that of the upcoming deadline to file a claim, and to reiterate his offer to coordinate applications.

91.     On January 19, 2016, *i.e.,* with the submission imminently due, Mr. Block finally responded to informed Mr. Barnes that "*I already had counsel handle this.*" Mr. Block had done exactly what Mr. Barnes had suggested, *i.e.*, hired "specialized whistleblower counsel," on information and belief to "work on a contingency basis" to handle the submission on behalf of Mr. Block, but not included Mr. Barnes on that process.

92.     At that point, it occurred to Mr. Barnes that Mr. Block might no longer adequately representing Mr. Barnes' interest. With the deadline looming, and Mr. Barnes' imminently expecting the birth of a child, Mr. Barnes promptly and hastily submitted an application for a whistleblower award, using the SEC's Form WB-APP. In light of the time sensitivities, Mr. Barnes could not retain counsel for his application.

93.     Even then, Mr. Barnes believed that the parties could continue to collaborate as each navigated the whistleblower application process. Accordingly, Mr. Barnes replied to Block, offering to provide additional source documents to Mr. Block or Muddy Waters, for the mutual benefit of both parties' applications.

94.     That was the last time Mr. Block returned one of Mr. Barnes' emails regarding Focus Media, despite Mr. Barnes' reaching out multiple times of the ensuing years to try to discuss the claim and their partnership agreement.

## H.  The Claims Review Staff Preliminarily Denies Both Applications for Substantially the Same Reason

95.     On July 29, 2019, the SEC's "Claims Review Staff" preliminarily denied Mr. Barnes' application, as well as Mr. Block's, for substantially the same reason. In particular,

the Claims Review Staff concluded that, because neither Mr. Barnes nor Block were

"whistleblowers" within the meaning of Rule 21F-2(a) because the SEC's investigation had been

opened after an SEC attorney found the FMCN Report online, and not because of information

either had been provided the SEC, via a Form TCR, which stands for "Tip, Complaint, or

Referral," or otherwise.

96.   In so doing, the Claims Review Staff explicitly rejected the theory that

"publishing an online report" constituted a "voluntary submission of information" to the SEC.

97.   The SEC's Whistleblower Rules permit a denied claimant to contest a

preliminary determination prior to the SEC's Office of the Whistleblower affirming or rejecting

the Claims Review Staff's determination, including, as part of such process, to request the

documents on which the determination is based.

98.   Mr. Barnes requested that record. Based on Mr. Block's earlier

representations that Defendants had told the SEC that that they partnered with Mr. Barnes on the

FMCN Report, Mr. Barnes believed the documents would include documents substantiating that

Mr. Barnes authored the FMCN Report and participated in its delivery it to the SEC.

99.   A few days later, the SEC sent Mr. Barnes his initial Form WB-APP, the

SEC's September 30, 2015 Notice of Covered Action against Focus Media and Jiang, and a

Declaration of Adam Grace, the attorney at the Enforcement Decision who had worked on the

Focus Media case.

100.   The Declaration, however was dated July 29, 2019, the same day the SEC

issues its preliminary denial to Mr. Barnes, and thus did not appear to have contemporaneous

information from 2011 through 2015, when Mr. Barnes was intimately involved. Likewise, the

Declaration was heavily-redacted, omitting all apparent references to co-claimants, such as Mr.

Block. The SEC did not disclose any original source materials or communications with between

Mr. Block or Muddy Waters and the SEC. It is thus impossible to determine what, if anything, Mr. Block or Muddy Waters communicated to the SEC concerning the relationship with or role of Mr. Barnes.

101.    In September 2019, Mr. Barnes was permitted a brief, approximately thirty-minute telephone call with the SEC Office of the Whistleblower. The SEC Office of the Whistleblower did not inform Mr. Barnes of the topics that he should cover to contest the negative determination. Nor did the SEC disclose that Mr. Block had been allowed to retroactively file a Form TCR after the $55.6 million settlement had been publicly announced.

102.    On October 7, 2019, Mr. Barnes submitted a written response in further support of his contestation of the Preliminary Determination.

**I.    The SEC Reverses the Preliminary Determination as to Mr. Block but Not Mr. Barnes, Awarding Mr. Block $14 Million and Mr. Barnes Nothing, Despite Acknowledging that Mr. Barnes was a Co-Author of the Report**

103.    On March 11, 2022, the SEC issued a "Final Order" denying Mr. Barnes' application. The SEC did so despite "credit[ing] both [Mr. Barnes and Block] as having been authors of the report," and acknowledging Mr. Barnes' "role in investigating the Company and in publicly exposing the wrongdoing at the Company through writing and publishing the online report."

104.    Though denying Mr. Barnes an award, the SEC would award *Mr. Block* an award of $14 million (approximately 25% of the total settlement with Focus Media and Jiang).

105.    The Final Order makes clear that the differentiating factors between the treatment of Mr. Barnes and Block was purely "discretionary."

106.    The SEC specifically noted it is Final Order that Mr. Block did *not* follow the SEC's Rules, and the $14 million award was not based on Mr. Block's technical compliance. More specifically, the Final Order states that, pursuant to Rule 21F-9(a) of the Whistleblower

Rules, a claimant must submit a TCR to the SEC within 30 days of supplying the tip to the SEC or, under a "automatic waiver" exception, within 30 days of constructive notice of the requirement to do so. Mr. Block, just like Mr. Barnes, did not do so.

107.    Nevertheless, the SEC then declared that "in the public interest and consistent with [… the SEC's] discretionary authority under Section 36(a) of the Exchange Act," that it would "waive" the TCR filing requirements for Mr. Block. The SEC Whistleblower Rules do not provide any guidelines for how the SEC is permitted to exercise this "discretion" to overrule a determination by its own Claims Review Staff.

108.    Among the "unusual facts and circumstances" the SEC cited was that the "information in [the FMCN Report] was highly credible and of high quality and caused Enforcement staff to open an investigation that ultimately resulted in the successful Covered Action and returned millions of dollars to harmed investor." The fact that the FMCN was "highly credible and of high quality" was, of course, attributable entirely to *Mr. Barnes'* involvement in the matter. The SEC thus credited *Mr. Block* with *Mr. Barnes'* research capabilities.

109.    The *other* cited "unusual facts and circumstances" make clear that Block had plainly not been honest or faithful to Mr. Barnes, and, indeed had been working to deliberately ensure that *only* Mr. Block—and *not* Mr. Barnes—receive the opportunity at sharing in any whistleblower award.

110.    The Final Report references a *different* instance—different from the Mr. Barnes' and Mrs. Block's emailing the FMCN Report to the SEC on November 21, 2011—where Mr. Block *separately* emailed the SEC a copy of the document. As noted above, Mr. Barnes and Mr. Block had agreed that they pre-determined *together* how and to whom they would send the FMCN Report. And, indeed, when the two agreed that Block—and *not* Mr. Barnes—would interface with the SEC, Mr. Block expressly assured Mr. Barnes that he would

*also* receive credit. Mr. Block had apparently not been truthful in his representations or faithful in the partnership.

111.    The Final Order makes clear that the decision for the SEC to overturn its own Claims Review Staff was equitable in nature—based on the SEC's own "discretionary" authority, *in spite of* Mr. Block's failure to abide by the technical requirements of the submission rules. Upon information and belief, Mr. Block deliberately undermined Mr. Barnes' application for Mr. Block's sole benefit—so that Mr. Block would not be forced to share the award.

112.    Moreover, since SEC whistleblower proceedings are under seal, Mr. Barnes never would have even been notified about the $14 million award to Mr. Block without submitting his own whistleblower application.

**J.  Mr. Barnes Attempts to Resolve the Dispute Amicably, But Mr. Block Escalates**

113.    In March 2022, following Mr. Barnes' receipt of the Final Order, Mr. Barnes attempted to contact Mr. Block to ascertain the truth of what Mr. Block had told (or failed to tell) the SEC concerning Mr. Barnes' involvement in the creation and the publication of FMCN Report. Mr. Block did not respond.

114.    Following Mr. Block's non-response, counsel for Mr. Barnes wrote to Mr. Block, to attempt to ascertain why—despite the parties' supposed collaboration, and Mr. Block's representation that he had credited Mr. Barnes with the publication of the FMCN Report—the SEC had treated the two differently and to attempt to resolve this dispute amicably.

115.    Counsel for Mr. Block refused to engage in substantive discussions concerning what Mr. Block told the SEC. Mr. Block was purportedly not interested in resolving the partnership dispute amicably.

116.    Accordingly, in July 2022, Mr. Barnes filed an action, via Summons with Notice, in the Supreme Court of New York. *See Barnes v. Carson Block and Muddy Waters,*

*LLC*, Index No. 652580/2022 (Sup. Ct. N.Y. Cty.). Defendants remove that action to federal court to the instant action.

117.    Mr. Block reacted by filing a retaliatory defamation lawsuit in federal court in Texas, which, despite containing mostly irrelevant vitriol and being largely factually inaccurate, correctly credits Mr. Barnes as having researched and written the FMCN Report. *See Block v. Barnes*, Case 1:22-cv-00869 (W.D. Texas). Depending on the outcome of a forthcoming motion, that action could be transferred to this Court and presumably consolidated with this action.

118.    Separately, on April 8, 2022, Mr. Barnes timely petitioned the Court of Appeals for the Third Circuit for review of the Final Order, as is permitted by Dodd-Frank.

119.    On May 3, 2022, the SEC filed a certified list of the materials it asserted constituted the record on appeal.[7] That list did not include any of the materials submitted by Mr. Block, further suggesting that Mr. Block had not properly informed the SEC of Mr. Barnes' role.

### FIRST CAUSE OF ACTION:
### <u>UNJUST ENRICHMENT</u>

120.    Plaintiff incorporates by reference the foregoing factual allegations.

121.    Mr. Barnes conducted rigorous due diligence on Focus Media and Jiang, traveled to Asia as his personal physical risk, and drafted the 80-page FMCN Report. By design, Mr. Barnes permitted Mr. Block and Muddy Waters to exclusively interface with the SEC and the public concerning the findings in that report.

---

[7] The SEC's regulations provide that the records available to denied claimant should include "any materials that were considered by the Commission in issuing the Final Order, and any materials that were part of the claims process[.]" 17 C.F.R. § 240.21F-13(b). That same regulation also indicates this includes materials submitted by co-claimants that "relate directly to the claimant who is seeking judicial review." *Id.*

122.    Defendants were enriched by his award of the $14 million whistleblower award.

123.    Defendants initially mislead Mr. Barnes into believing that they were protecting his interest in communications with the SEC such that Mr. Barnes would receive credit for the FMCN Report. Later, on information and belief, Defendants undermined Mr. Barnes' role with respect to the FMCN Report through the whistleblower application process.

124.    As of a result of Mr. Barnes being cut out of a whistleblower award, Mr. Block was able to retain 100% of the award, which would otherwise have been shared. The $14 million to Mr. Block is a windfall, and the expense of Mr. Barnes.

125.    It would be against equity and good conscience to permit Mr. Block to retain the entire $14 million whistleblower award. The original focus of the parties' partnership was the publication of the FMCN Report, such that the $14 million award is found money.

## SECOND CAUSE OF ACTION:
## CONSTRUCTIVE TRUST

126.    Plaintiff incorporates by reference the factual allegations above.

127.    Mr. Barnes and Defendants were in a confidential and/or fiduciary relationship because they expressly agreed on confidentiality, took considerable measures to ensure confidentiality (including using encrypted communication tools), required the anonymity of Mr. Barnes, and were partners in a joint venture concerning sensitive investment research.

128.    Mr. Barnes and Defendants promised to partner on the Focus Media project, including sharing credit for their research and any economic benefits arising from their collaboration.

129.    In reliance on their collaboration and the promise inherent thereto, Mr. Barnes performed substantially all the work on the Focus Media project, including at

considerable effort and threat of safety, and abstained from communications with the SEC which would have otherwise made clear his role with respect to the FMCN Report.

130.    Defendants were unjustly enriched by the $14 million whistleblower award because that award constitutes a windfall at Mr. Barnes' expense and found money which was not the primary focus of the parties original collaboration.

**THIRD CAUSE OF ACTION:**
**<u>BREACH OF FIDUCIARY DUTY</u>**

131.    Plaintiff incorporates by reference the factual allegations above.

132.    Mr. Barnes and Defendants formed a partnership wherein Mr. Barnes would perform high-quality research, including with opportunity cost and risk of personal safety to Mr. Barnes. Mr. Block and Muddy Waters were permitted to utilize in the work. The parties agreed that they would share in the economic benefits of the reports they created. The parties thus owed fiduciary duties to one another with respect to the FMCN Report.

133.    Mr. Barnes performed under the partnership, including conducting high-quality research forming the basis of the FMCN Report, traveling to Asia at security risk to Mr. Barnes, drafting and publishing the FMCN Report, and abstaining being the public face of the FMCN Report.

134.    Defendants breached their duty of loyalty by failing to credit Mr. Barnes for his role in the FMCN Report to the SEC or compensating him for his portion of the $14 million whistleblower award.

135.    As a result of Defendants' breach, Mr. Barnes was harmed.

WHEREFORE, Plaintiff respectfully requests relief in the form of:

A.  Judgment and damages in excess of $7 million;

B.  Imposition of a constructive trust over the $14 million the SEC awarded to Mr. Block; and

C.  Such other costs, fees, and further relief as the Court may determine appropriate in accordance with law.

Dated:  September 26, 2022
New York, NY

SLARSKEY LLC


By:_____
Evan Fried
David Slarskey
420 Lexington Avenue, Suite 2525
New York, NY 10022
(212) 658-0661
*Counsel for Plaintiff Kevin Barnes*