UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KEVIN BARNES,

Plaintiff,

- against -

CARSON BLOCK and MUDDY WATERS, LLC,

Defendants.

Case No.: 22-cv-7236 (VSB)(RWL)

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FOURTH CAUSE OF ACTION**

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES .......... iii

PRELIMINARY STATEMENT .......... 1

BACKGROUND FACTS .......... 3

A. The Partnership Between Barnes and Defendants .......... 3

B. The September 14, 2011 Meeting .......... 4

C. The Parties' Performance .......... 5

D. The SEC Investigation and the Award .......... 6

E. The Court Denies-in-Part Defendants' Motion to Dismiss .......... 7

F. Defendants' Deposition Testimony .......... 8

G. Magistrate Judge Ricardo Grants Leave to Amend .......... 8

ARGUMENT .......... 9

I. The Statute of Frauds Does Not Bar Plaintiff's Contract Claim .......... 9

A) The Statute of Frauds Does Not Apply to a Joint Venture Relationship With No Definite Term .......... 9

i. The Lack of Definite Term Supports Barnes' Position .......... 11

ii. The Statute of Frauds Does Not Apply Where Future Compensation Relates to Past Performance Only .......... 12

B) Even if the Statute of Frauds Applies, Defendants Admit to a Writing .......... 15

II. Plaintiff Has Adequately Pled a Breach of Contract Claim .......... 15

A) Plaintiff Adequately Pleads the Existence of a Contract .......... 16

B) Plaintiff Pleads With Definiteness the Essential Terms of the Contract .......... 19

i. Plaintiff Adequately Pleads That He Performed .......... 22

ii. Plaintiff Adequately Pleads that Defendants Breached the Contract .......... 23

CONCLUSION .......... 24

# TABLE OF AUTHORITIES

**Cases**

*Apostolos v. R.D.T. Brokerage Corp.*
159 A.D.2d 62 (1st Dep't 1990) .......... 13

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) .......... 9

*Balder v. Sarandon*
2023 WL 9232957 (S.D.N.Y. Dec. 18, 2023) .......... 13, 14

*Basu v. Alphabet Mgmt. LLC*
127 A.D.3d 450 (1st Dep't 2015) .......... 20

*Bell Atl. Corp. v. Twombly*
550 U.S. 544 (2007) .......... 9

*Boustead Sec., LLC v. Leaping Grp. Co., Ltd.*
2021 WL 3774116 (S.D.N.Y. Aug. 25, 2021) .......... 22

*Burton v. iYogi, Inc.*
2015 WL 4385665 (S.D.N.Y. Mar. 16, 2015) .......... 17

*Chambers v. Time Warner, Inc.*
282 F.3d 147 (2d Cir. 2002) .......... 18

*Charles Hyman, Inc. v. Olsen Indus., Inc.*
227 A.D.2d 270 (1st Dep't 1996) .......... 21

*Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*
74 N.Y.2d 475 (1989) .......... 19

*Cron v. Hargro Fabrics, Inc.*
91 N.Y.2d 362 (1998) .......... 10, 12, 13, 14

*D & N Boening, Inc. v. Kirsch Beverages, Inc.*
63 N.Y.2d 449 (1984) .......... 10, 14

*DiFolco v. MSNBC Cable L.L.C.*
622 F.3d 104 (2d Cir. 2010) .......... 18

*Doe (Claimant #2) v. Sec. & Exch. Comm'n*
2023 WL 3562977 (3d Cir. Mar. 23, 2023) .......... 7, 23

*Edwin v. Arackal*
241 A.D.2d 335 (1st Dep't 1997) .......... 21

*Exch. Listing, LLC v. Inspira Techs., Ltd.*
661 F. Supp. 3d 134 (S.D.N.Y. 2023) .......... 15, 19

*Foster v. Kovner*
44 A.D.3d 23 (1st Dep't 2007) .......... 2, 10, 11, 14

*Grasso v. Donnelly-Schoffstall*
2022 WL 728839 (2d Cir. Mar. 11, 2022) .......... 13

*Great Destinations, Inc. v. Transportes Aereos Portugueses S.A.R.L.*
460 F. Supp. 1160 (S.D.N.Y. 1978) .......... 15

*Guterman v. RGA Accessories, Inc.*
196 A.D.2d 785 (1st Dep't 1993) .......... 12

*Hecht v. Helmsley-Spear, Inc.*
65 A.D.3d 951 (1st Dep't 2009) .......... 21

*Hubbell v. T.J. Madden Constr. Co.*
32 A.D.3d 1306 (4th Dep't 2006) .......... 12

*Johnson v. Giles*
2024 WL 4240446 (S.D.N.Y. Sept. 19, 2024) .......... 13

*Johnson v. Levy*
812 F. Supp. 2d 167 (E.D.N.Y. 2011) .......... 17

*Johnson v. Spence*
286 A.D.2d 481 (2d Dep't 2001) .......... 21, 22

*Kramer v. Greene*
142 A.D.3d 438 (1st Dep't 2016) .......... 19

*Law Offices of K.C. Okoli, P.C. v. Maduegbuna*
62 A.D.3d 477 (1st Dep't 2009) .......... 20

*Martocci v. Greater N.Y. Brewery*
301 N.Y. 57 (1950) .......... 13

*Moses v. Savedoff*
96 A.D.3d 466(1st Dep't 2012) .......... 11, 14

*Muhlstock v. Cole*
245 A.D.2d 55 (1st Dep't 1997) .......... 20

*Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*
861 F. Supp. 2d 344 (S.D.N.Y. 2012) .......... 23

*Noriega v. Abbott Lab'ys*
714 F. Supp. 3d 453 (S.D.N.Y. 2024) .......... 17, 18

*Novartis Pharma AG v. Incyte Corp.*
520 F. Supp. 3d 514 (S.D.N.Y. 2021) .......... 23

*Rackson v. Sosin*
2001 WL 266981 (2d Cir. Mar. 16, 2001) .......... 19

*Ramgoolie v. Ramgoolie*
2017 WL 9565534 (S.D.N.Y. May 31, 2017) .......... 2, 10, 11

*Rella v. McMahon*
169 A.D.2d 555 (1st Dep't 1991) .......... 11

*Rhee v. SHVMS, LLC*
2022 WL 596366 (S.D.N.Y. Feb. 28, 2022) .......... 2, 10

*Rosenthal v. Kingsley*
674 F. Supp. 1113 (S.D.N.Y. 1987) .......... 13

*Roth v. Jennings*
489 F.3d 499 (2d Cir. 2007) .......... 17

*Ryan v. N.Y. Tel. Co.*
62 N.Y.2d 494 (1984) .......... 23

*Spencer-Smith v. Ehrlich*
347 F.R.D. 606 (S.D.N.Y. 2024) .......... 22

*Swan Media Grp., Inc. v. Staub*
841 F. Supp. 2d 804 (S.D.N.Y. 2012) .......... 22

*Tal v. Computech Int'l, Inc.*
2024 WL 4836345 (E.D.N.Y. Nov. 20, 2024) .......... 13

*Tamara Brokerage, Inc. v. Andreoli*
24 A.D.3d 536 (2d Dep't 2005) .......... 13

**Statutes**

C.P.L.R. § 213(2) .......... 14

Fed. R. Civ. P. 12(b)(6) .......... 9, 19

Fed. R. Civ. P. 8(a) .......... 21

Fed. R. Civ. P. 8(d) .......... 7, 16, 17

N.Y. Gen. Oblig. L. § 5-701 .......... 9

N.Y. P'ship Law § 40(1) .......... 21

**PRELIMINARY STATEMENT**

In 2011, Plaintiff Kevin Barnes ("Barnes") and Defendants Carson Block ("Block") and Muddy Waters, LLC ("Muddy Waters," and together "Defendants") formed a joint venture to research and publish materials concerning China-based Focus Media Research, Inc. ("Focus Media"). Barnes, in his initial pleading, asserted that Defendants breached their fiduciary duties and/or were unjustly enriched when Defendants collected a $14 million SEC whistleblower award without compensating Barnes—allegations which this Court sustained in relevant part.

Defendants have consistently denied the existence of *any arrangement*—much less an *agreement*—with Barnes. In their original Answer, they asserted that Barnes and Defendants had no meeting of the minds and did not agree on the scope of any alleged agreement. (ECF No. 47 at 13–15.) Likewise, in Defendants' initial Fed. R. Civ. P. 26(a)(1)(ii) disclosures, Defendants did not identify the existence of—much less produce—any written agreement with Barnes.

Barnes took the deposition of Block in May 2026. Under oath, Block testified, a stark departure from his previous stance, that his position now is that there *was* an arrangement between Defendants and Barnes (Ex. 1 (Block Dep. Tr., dated May 12, 2026) at 117:12-118:10, 150:23-151:5), that, following a critical hotel meeting between the parties in 2011, there *was* a meeting-of-the-minds (*id.* at 149:21-150:17), but that the disagreement between parties is the *terms* of such relationship. (*See id.*) Moreover, and for the very first time, Block swore repeatedly as to his belief that that he or his entity and Barnes entered into a *written agreement* in 2011 and that this supposed agreement contained terms governing the parties' relationship. He stated, however, that to the extent this alleged agreement ever existed, he can no longer find it because he lost wholesale access to any documents between approximately 2011–2013. (*Id.* at 132:22-25, 133:9-20, 134:1-7.)

Barnes' position is that Defendants and Barnes were to split net proceeds from their relationship, as they did when they sold research to a third-party investment fund. Block, by

contrast, posits that Barnes' only compensation—for months' of on-ground work in Asia with no upfront salary—was reimbursement for travel expenses and a potential bonus at the Block's discretion. (Ex. 1 at 158:13-159:13, 72:12-74:21 (Block admitting he did not investigate the legality of any such arrangement).) Thus, there is no doubt a dispute as to the *terms* of the deal.[1]

But Barnes does not necessarily oppose the premise that the parties' relationship sounds in *contract*—as opposed to *fiduciary duty*. That is simply a legal conclusion. That that end, upon learning of Block's newfound narrative, Barnes sought leave to amend his pleading to bring a claim for breach of contract. Magistrate Judge Ricardo granted that relief over Defendants' objections, acknowledging that the new claim is merely plead in the alternative. Defendants' attempts to evade their own admissions, and to relitigate the initial rejection of Defendants arguments, should be denied.

The statute of frauds is no obstacle to Barnes' contract claim. The statute is "generally not applicable to agreements that are not in writing and subscribed to that are agreements to form a joint venture or a partnership unless the agreement has a specified durational term that exceeds one year." *Rhee v. SHVMS, LLC*, 2022 WL 596366, at *3 (S.D.N.Y. Feb. 28, 2022) (citing *Ramgoolie v. Ramgoolie*, 2017 WL 9565534, at *7 (S.D.N.Y. May 31, 2017); *Foster v. Kovner*, 44 A.D.3d 23, 27 (1st Dep't 2007)). And even if it were, Barnes' new claim includes *Defendants'* sworn statement that there is a written agreement exists. There is no contradiction insofar as this Court has already recognized that parties may plead in the alternative.

Defendants' substantive challenges also fail. Barnes adequately pleads the elements of a breach of contract claim: an agreement, performance, and breach. Formation rests on detailed

[1] Needless to say, Barnes disagrees with Block's likely-illegal theory wherein Barnes executed a written instrument agreeing that he would work for free.

allegations of negotiation and consummation of an agreement, not on Block's testimony; the terms are supplied by a simple 50-50 net revenue deal and Block's own previous performance of a deal he now denies; and whether a whistleblower award falls within "monetization" of the research is a question of interpretation, not a pleading defect. Defendants' motion should be denied.

## BACKGROUND FACTS

### A. The Partnership Between Barnes and Defendants

In 2011, Barnes and Defendants formed a research and trading partnership concerning U.S.-listed companies operating in the People's Republic of China ("PRC"). (*See* ECF No. 123 ("Amended Complaint") ¶¶ 2, 23, 32.)[2] Block had recently formed Muddy Waters, a vehicle to publish research, short-sell stocks, and garner media attention. (¶¶ 26–30.) At the time, Block was a newcomer to the space, and Muddy Waters lacked permanent capital or employees. (*Id.*) Block recruited Barnes because of Barnes' bulge-bracket investment banking experience and skill in investigating companies operating in PRC. (¶¶ 18–31.) The partnership structure enabled Barnes and Block to each grow his business, share costs and profits, and simultaneously maintain an element of professional independence. (¶ 31.)

The two began collaborating on PRC-based projects. (¶ 32.) The parties expressly and invariably called their relationship a "partnership," and their conduct reflected it. (¶ 51.) They worked together on several projects under the partnership (¶¶ 33–41), including a successful first project on China Shen Zhou Mining & Resources, Inc., which became proof-of-concept. (¶ 33) Because of the success, Block courted Barnes more aggressively to brainstorm and collaborate on follow-up projects, which they in fact performed. (¶¶ 37–41.)

---

[2] All cites to Plaintiff's Amended Complaint will henceforth be marked with ¶.

Barnes and Defendants "operated as partners," sharing profits and losses. (¶ 40.) Barnes did not work as an employee for guaranteed salary or at the expense of a principal. (*Id.*) To the contrary, Barnes (not unlike Defendants) invested capital to fund the retrieval of documents, access third-party databases, book international travel, and otherwise perform. (¶¶ 34, 52–26.) The parties "alternate[d] . . . who would incur the cost of a particular report." (¶ 40.) Because the parties did not publish all of their projects, and did not always generate revenue from the sale of projects, Barnes—in fact—took financial losses from some of the research. (¶¶ 39–40.)

Paragraph 40 pleads the practice that governed those collaborations:

> Mr. Block and Defendants operated as partners: Mr. Barnes would research and publish high quality research, with Mr. Barnes and Defendants alternating as to who would incur the cost of a particular report; they would then publish the research; and each traded the stock at its independent risk. Though Defendants did not sell the reports to a third-party, the parties had agreed that, if that were to occur, they would share in the net revenues from such transaction.

(¶ 40.) This Court has already held that this allegation, together with ¶ 68, supports the inference that the parties agreed to share profits and losses. (*See* ECF No. 41 at 16.)

**B. The September 14, 2011 Meeting**

In September 2011, Block contacted Barnes about a new opportunity, Focus Media, then a $3.4 billion Nasdaq-listed PRC-based advertising company. (¶ 42.) Block suspected that Focus Media and its executive had misrepresented the business to investors, but lacked the research and financial analytics bandwidth to demonstrate his suspicions, and thus required Barnes' expertise to successfully execute the project. (¶ 44.)

The two met on September 14, 2011 to discuss the opportunity and the structure of their arrangement. (¶ 43.) At that meeting they "hashed out the terms" of their agreement. (¶ 45.) More specifically: (i) similar to the parties' prior collaborations, Barnes would provide the research and financial analysis and Defendants would publicize the findings; (ii) each side could trade the

security at its own risk; and (iii) if the report generated revenue, the parties would share in those proceeds equally. (¶ 46.) The parties further agreed that the project would be conducted covertly through the name "Project PHOENIX," the parties would use pseudonyms, and all communications would run through Kimpax.com, an encrypted platform Block hosted (and to which he later cut off Barnes' access). (¶¶ 49–50, n.4.) "At the end of the September 14 meeting, Mr. Barnes and Mr. Block shook hands on the partnership." (¶ 51.)

**C. The Parties' Performance**

Barnes performed. Barnes conducted in-depth analysis of Focus Media, pulling hard-to-find materials and populating a data room with documents later referenced in the report. (¶¶ 52–53.) In October 2011, Barnes traveled to Thailand to oversee retrieval of filings unobtainable in the United States. (¶¶ 54–55.) Barnes diagnosed the "Allyes" transactions as a core problem, determining through securities filings, corporate registry documents, and translated regulatory filings that assets had been divested to insiders in a series of self-dealing transactions. (¶ 57.) He worked under a cyberattack that locked him out of his accounts, and weeks after an attorney retained on a related investigation had been credibly threatened with violence. (¶ 58.)

After a month in Asia, Barnes returned to the United States in November 2011 and worked from Block's residence to finish the report. (¶¶ 59–60.) On November 20 he finalized it: an 80-page document supported by 111 footnotes to source materials he had largely gathered. (¶ 61.) The next morning Barnes and Block's wife prepared it for distribution, built a recipient list, emailed the publication widely, and tweeted it to approximately 80,000 followers. (¶¶ 62–67.) Within hours the stock fell as much as 66% intraday. (¶ 69.)

Defendants, for their part, also (then) performed consistent with the partnership. Contemporaneous with the release of the report publicly, Block, on behalf of the partnership marketed the Focus Media research to a third-party investment fund. (¶ 69.) Consistent with the

partnership, Block remitted to Barnes his 50% share of the net revenue from that sale. (*Id.*) This Court previously found that the parties' splitting of such proceeds—which Defendants now have admitted in writing to be a "partner distribution"—support a partnership. (ECF No. 41 at 16 ("Plaintiff's factual allegations are sufficient to support the inference that the parties entered into a partnership. First, Plaintiff has alleged that the parties agreed that they would share profits and losses from the Report, including that they 'had agreed that [if they were to sell the reports to third-parties], they would share in the net revenues from such a transaction.' (¶ 40.) Indeed, Plaintiff alleges that, after the sale of the FMCN Report to a third party, Block 'remitted to Mr. Barnes his share of the net revenue, after total project expenses, from that sale.' (*Id.* ¶ 68.)").)

**D. The SEC Investigation and the Award**

In December 2011, the Securities & Exchange Commission ("SEC") opened an investigation into Focus Media, and its CEO Jason Jiang ("Jiang"). (¶¶ 70–73.) Barnes and Block met to discuss the same, and decided that, consistent with their arrangement, Block would communicate with the SEC. (¶¶ 74–76.) Block expressly assured Barnes that the SEC was aware Barnes had authored the FMCN Report, and would be credited to that effect. (¶¶ 72–78.)

In September 2015, the SEC announced that it had entered into a settlement with Focus Media and Jiang for $55.6 million. (¶ 79.) The SEC invited those who believed they had provided material information to the SEC to apply for whistleblower bounties. (¶ 81.)

Barnes and Block conversed about the mechanics for submissions. (¶¶ 85–87.) At the time, the SEC whistleblower program and rules were in their infancy (¶¶ 82–84), and the parties' communications reflect confusion over how to, and who could, apply. (¶¶ 88–90.) Ultimately, in January 2016, Barnes and Block independently submitted applications. (¶¶ 90–93.)

In July 2019, the SEC denied both Barnes' and Block's applications, but invited both parties to appeal, which both parties did. (¶¶ 95–100.) On March 11, 2022, the SEC issued a "Final

Order" denying Barnes' application (¶ 103) and granting Block a $14 million award. (¶ 14.) Although, according to the Final Order, Block did not meet the "technical" requirements under the whistleblower rules, the SEC nonetheless granted Block the award under its "discretionary" authority because the information in the FMCN Report was "highly credible and of high quality" (¶¶ 15, 108) and, separate from Barnes' and Block's joint furnishment of the FMCN Report to the SEC, Block had also independently sent the SEC the FMCN Report a second time. (¶ 110.)

Barnes subsequently appealed the Final Order before the Third Circuit Court of Appeals. *See Doe (Claimant #2) v. Sec. & Exch. Comm'n*, 2023 WL 3562977, at *3 (3d Cir. Mar. 23, 2023). That petition was denied.

**E. The Court Denies-in-Part Defendants' Motion to Dismiss**

Barnes filed a Summons with Notice in the Supreme Court of the State of New York, on July 25, 2022. (ECF No. 1-5.) Defendants removed (ECF No. 1) and Barnes filed his original complaint on September 28, 2022 (ECF No. 13) with claims for unjust enrichment, constructive trust, and breach of fiduciary duty premised on an oral partnership formed at the September 2011 meeting.

On June 23, 2025, the Court granted Defendants' motion to dismiss as to the constructive trust claim and denied it in all other respects. (ECF No. 41.) Three aspects of that ruling bear on this motion. *First*, the Court held that Fed. R. Civ. P. 8(d)(2)-(3) permits alternative pleading and that there was nothing incoherent about Barnes advancing "separate theories of recovery premised on a disputed fact." (*Id.* at 13–14.) *Second*, the Court held that the pleading plausibly alleged an oral partnership, resting the profit-and-loss-sharing element expressly on ¶ 40 and ¶ 68. (*Id.* at 15–17.) *Third*, the Court held that the claim "had not accrued under New York law" at the time of the 2016 award applications "because he had yet to be left out of any whistleblower award," and that on the face of the pleading it did not accrue until 2022-2023. (*Id.* at 19–20.)

**F. Defendants' Deposition Testimony**

Block was deposed on May 12 and 14, 2026. (¶ 120.) Contrary to Defendants' previous positions, Block for the first time testified, *inter alia*, that the parties in fact agreed to all "material terms" at the September 14, 2011 meeting, that there was assent walking out of that meeting, and that the disagreement arose *only years later* when the parties disagreed as to the terms of their agreement. (Ex. 1 at 117:12-118:10, 149:21-151:5, 149:2.)

Block also testified, on several occasions, that he believed that Defendants and he documented their agreement in writing, and that such agreement contained both the economic and confidentiality terms to which they were bound. (*See id.* at 11:24-12:4, 12:18-21, 27:16-20, 122:4-17, 130:17-132:7, 143:4-19, 144:11-13.) When asked about the whereabouts of this supposed document, Defendants stated they searched—but cannot find—the alleged document because such documents were irretrievably lost when Defendants lost access to the "Kimpax" cloud system they previously maintained sometime between 2011 and 2012. (*Id.* at 132:22-25, 133:9-20, 134:1-7.) Defendants testified that, to the extent this agreement ever existed, they do no dispute that they never terminated it in writing or otherwise. (*See id*. at 134:18-21, 256:15-17.)

**G. Magistrate Judge Ricardo Grants Leave to Amend**

On June 9, 2026, Barnes sought a pre-motion conference regarding leave to amend to add a contract claim in the alternative. (ECF No. 113.) Defendants opposed, on substantially the grounds they press now, and requested to brief the motion. (ECF No. 115.)

Magistrate Judge Ricardo held the conference on June 23, 2026 and granted leave to amend over Defendants' objection. (ECF Nos. 117–18.) At that conference, the Court asked counsel to explain what the new claim added and was told that it was "an entirely new legal theory based on Defendants' own admission that there was some form of an agreement," and asked whether it was "a fallback theory," and was told it was "certainly an alternative theory." (ECF No. 118 at 9:9-

10:3.) On July 8, 2026, the Court set August 7, 2026 as Defendants' response date and ordered a supplemental discovery period running through September 15, 2026. (ECF No. 122.) The Amended Complaint was filed on July 9, 2026. (ECF No. 123.) This motion followed.

The Fourth Cause of Action incorporates every preceding allegation (¶ 142) and is "pleaded in the alternative to the First through Third Causes of Action" (¶ 143). It alleges that the terms of the parties' agreement "included that each party would trade for his own account, but would split proceeds from any monetization of the research that Mr. Barnes conducted in connection with Defendants" (¶ 145); that Barnes performed (¶ 147); and that Block "received a $14 million whistleblower award but failed to remit Mr. Barnes his portion of such proceeds." (¶ 148).

## ARGUMENT

On a motion under Rule 12(b)(6), the Court should accept the complaint's factual allegations as true and draws all reasonable inferences in the plaintiff's favor. The pleading need only contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). As discussed *infra* Section II.A, Defendants' motion, particularly to the extent it relies on the deposition of Block as documentary evidence to be considered on a motion to dismiss, asserts incorrect standards.

### I. The Statute of Frauds Does Not Bar Plaintiff's Contract Claim

#### A) The Statute of Frauds Does Not Apply to a Joint Venture Relationship With No Definite Term

Contrary to Defendants' assertions, the Statute of Frauds (the "Statute"), N.Y. Gen. Oblig. L. § 5-701, is inapplicable. (ECF No. 131 (Def. Br.) at 11–12.) Oral agreements violate the Statute's writing requirement only when "by their very terms [they] have absolutely no possibility in fact and law of full performance within one year." *D & N Boening, Inc. v. Kirsch Beverages,*

*Inc.*, 63 N.Y.2d 449, 454 (1984). "The question is not what the probable, or expected, or actual performance of the contract was; but whether the contract, according to the reasonable interpretation of its terms, required that it should not be performed within the year." *Id.* (citation omitted). Where an agreement is susceptible of fulfillment within that time, "in whatever manner and however impractical," the provision does not apply, and it matters not whether there is "extreme unlikelihood of completion within one year[.]" *Id.* at 455–56. Where the pleading presents a question whether the agreement could have been performed within a year, dismissal is improper. *Cron v. Hargro Fabrics, Inc.*, 91 N.Y.2d 362, 366–67 (1998).

The Statute is "generally not applicable to agreements that are not in writing and subscribed to that are agreements to form a joint venture or a partnership unless the agreement has a specified durational term that exceeds one year." *Rhee*, 2022 WL 596366, at *3 (citing *Ramgoolie*, 2017 WL 9565534, at *6–7; *Foster*, 44 A.D.3d at 27 ("[T]he statute of frauds is generally inapplicable to an agreement to create a joint venture . . . because, absent any definite term of duration, an oral agreement to form a partnership or joint venture for an indefinite period creates a partnership or joint venture at will")).

That is what is presented. Barnes alleges—and this Court has held Barnes amply sets forth—an oral joint venture between Defendants and him to research PRC-based companies, including Focus Media, that Barnes and Defendants would each shoulder the costs of the venture without upfront-guaranteed compensation, and that, if their work resulted in net revenues, they would split such proceeds, just as they did previously. (ECF No. 41 at 15–17 (sustaining Barnes' claim for joint venture).) Barnes does not allege, nor was there, any "specified durational term that exceeds one year." *Rhee*, 2022 WL 596366, at *3. The Statute is inapplicable. *Ramgoolie*, 2017

WL 9565534, at *8 ("the absence of a durational term in the oral agreement alleged by Plaintiff indicates that it is not subject to the Statute of Frauds . . .").

**i. The Lack of Definite Term Supports Barnes' Position**

Defendants' lead argument is that because the agreement had "lack[ed] [] any reasonable end-date" and was "not alleged to be terminable by either party," it must be within the Statute's one-year language. (Def. Br. at 11–12.) This argument supports *Barnes'* position. "[T]he statute of frauds is generally inapplicable to an agreement to create a joint venture because . . . absent any definite term of duration, an oral agreement to form a partnership or joint venture for an indefinite period creates a partnership or joint venture at will" and is dissolvable on a moment's notice and therefore capable of full performance within a year. *Foster*, 44 A.D.3d at 26–27; *see also Rella v. McMahon*, 169 A.D.2d 555, 555 (1st Dep't 1991); *Moses v. Savedoff*, 96 A.D.3d 466, 469–70 (1st Dep't 2012).

This Court has already held that the pleading alleges a partnership agreement between Barnes and Defendants, finding the profit-and-loss-sharing satisfied on the strength of ¶ 40 and ¶ 68. (ECF No. 41 at 15–17.) The performance of the partnership agreement was a discrete project completed in ten weeks, and what remained was arithmetic. Specifically, the Amended Complaint alleges an agreement reached on September 14, 2011 (¶¶ 43–47) that produced its intended product on November 21, 2011 (¶¶ 52–67)—roughly ten weeks. It alleges no continuing obligation on part of Barnes thereafter. Under the authority, the lack of a definite term of the partnership takes the relationship *outside* the Statute. *Moses*, 96 A.D.3d at 469 (statute inapplicable to oral joint venture for an indefinite period, and agreement to share profits of certain matters, "reasonably interpreted, could have been performed within one year").

### ii. The Statute of Frauds Does Not Apply Where Future Compensation Relates to Past Performance Only

Defendants next assert that the fact that the SEC whistleblower award was granted in 2022 takes this the partnership within the Statute. (*See* Def. Br. 11–13.) This too fails.

The facts here are similar to *Cron*, in which the Court of Appeals held that an oral promise to pay a bonus of twenty percent of profits fell outside the Statute even though the amount could not be computed until after year-end, because "when the [] relationship is terminable within a year and the measure of compensation has become fixed and earned during the same period, the sole obligation to calculate such compensation will not bring the contract within the one-year proscription of the Statute of Frauds." 91 N.Y.2d at 370. A later duty of computation "relates to past performance only," and "[t]he fact that the amount of the payment due may not be ascertained until some future time creates no new obligations." *Id.* at 369 (citation omitted). Because "the measure of defendant's obligation . . . is fixed within a year, the dangers envisioned by the Statute of Frauds do not come into play." *Id.* at 370; *see Hubbell v. T.J. Madden Constr. Co.*, 32 A.D.3d 1306, 1306–07 (4th Dep't 2006) (oral agreement providing for profit sharing outside the Statute where plaintiff's rights could be fixed and earned within a year). Here, on the pleaded facts, whatever Barnes was owed was fixed and earned when the research was completed and published in November 2011. What remained was computation. *Cron*, 91 N.Y.2d at 366–67.

Defendants similarly argue that the agreement is within the Statute because their obligation "hinged on the actions of third parties." (Def. Br. at 12.) But every authority Defendants cite for this argument involves an ongoing relationship in which *plaintiff's* performance obligation was continuing in order to make the plaintiff eligible for commissions. *Guterman v. RGA Accessories, Inc.* concerned "[t]he indefinite promise to pay commissions on all future sales[.]" (Def. Br. at 12 (citing 196 A.D.2d 785, 785 (1st Dep't 1993).) *Tamara Brokerage, Inc. v. Andreoli* concerned

commissions on insurance policy *renewals*, an obligation "completely within the control of" third-party policyholders that continued for as long as they renewed. (Def. Br. at 12 (citing 24 A.D.3d 536, 537 (2d Dep't 2005).) *Rosenthal v. Kingsley* concerned a standing entitlement to twenty-five percent of gross income "whenever said income is received[.]" (Def. Br. at 11–12 (citing 674 F. Supp. 1113, 1122 (S.D.N.Y. 1987).) *Tal v. Computech Int'l, Inc.* and *Johnson v. Giles* are commission cases in which the plaintiff was obligated to keep producing business or share royalties over time. 2024 WL 4836345, at *1 (E.D.N.Y. Nov. 20, 2024); 2024 WL 4240446, at *6 (S.D.N.Y. Sept. 19, 2024). *Grasso v. Donnelly-Schoffstall* turned on a contract of indefinite duration terminable only by breach. 2022 WL 728839, at *2 (2d Cir. Mar. 11, 2022).

The distinction is the one *Cron* itself drew between a fixed, earned obligation awaiting computation and "[a] continuing liability" arising from a relationship that "will continue beyond a year." 91 N.Y.2d at 368–69 (discussing *Martocci v. Greater N.Y. Brewery*, 301 N.Y. 57 (1950)). The First Department applied that distinction directly in *Apostolos v. R.D.T. Brokerage Corp.*, severing an oral brokerage agreement and enforcing the portion covering original placements while holding the renewal-commission portion barred. 159 A.D.2d 62, 64–66 (1st Dep't 1990). Barnes' claim is an original-placement claim: he performed once, on one project, and finished in ten weeks; that proceeds from that partnership might arise a decade later does not take it within the Statute. *Cron*, 91 N.Y.2d at 368–69.

*Balder v. Sarandon*, on which Defendants heavily rely, does not carry the weight they assign it. Defendants read *Balder* for the proposition that "[a] contract term for a percentage of profits for an indefinite period falls within the Statute of Frauds" regardless of the parties' expectations. (Def. Br. at 14 (citing 2023 WL 9232957, at *4 (S.D.N.Y. Dec. 18, 2023).) But that formulation contains its own *express* limiting condition: *for an indefinite period*. *Balder* involved

an ongoing enterprise in which profit participation was open-ended and the relationship had no terminus. The concern was the absence of any endpoint to the parties' mutual obligations, not that a payment might arrive later. Read otherwise, *Balder* would place every profit-sharing agreement within the Statute and would be irreconcilable with *Cron*, which enforced precisely such an arrangement, and with *Foster* and *Moses*, which hold that indefinite duration takes a joint venture *out* of the Statute. Here, where the plaintiff's performance is a single completed deliverable, the pleading alleges no continuing duty on either side, and the relationship is alleged to be a partnership, *Balder* does not govern.

Finally, Defendants devote two pages to the proposition that an SEC whistleblower award could not have issued within a year. (Def. Br. at 13–14.) The argument misidentifies what must be capable of performance within a year: the question is whether *plaintiff's performance*, by its terms, could be fully performed within a year, not whether one contingency that might trigger payment was likely to mature in that period. *D & N Boening*, 63 N.Y.2d at 455. On Defendants' theory, any oral agreement to share in the proceeds of an asset would fall within the Statute because the asset might not be sold for years. This is simply not the law in New York.

Because Barnes' performance was within one year, even if proceeds arose thereafter, the Statute does not apply. *Cron*, 91 N.Y.2d at 367.[3]

[3] Defendants also argue that Plaintiff is "trapped between the statute of limitations and the Statute of Frauds" and that to avoid CPLR 213(2) he must contend the promise was "so eternal" that it survived a decade. (Def. Br. at 14.) This is wrong. There is no limitations trap, because this Court already held that Barnes' fiduciary duty claim "had not accrued under New York law" when the applications were submitted "because he had yet to be left out of any whistleblower award," and that on the face of the pleading it did not accrue until 2022–2023. (ECF No. 41 at 19–20.) A claim for non-payment does not accrue until the payment is withheld. That is not an eternal promise; it is an ordinary obligation, and Defendants identify no authority treating a payment contingency as a durational term for Statute purposes.

### B) Even if the Statute of Frauds Applies, Defendants Admit to a Writing

The Statute is met where there is a written agreement on point. *Great Destinations, Inc. v. Transportes Aereos Portugueses S.A.R.L.*, 460 F. Supp. 1160, 1163 (S.D.N.Y. 1978). Here, Defendants allege there was a signed agreement in 2011—which they can no longer identify—which governs. (¶¶ 144–47.) Thus, Barnes has met the standard, required or not.

Defendants seek dismissal for lack of a subscribed writing in the same brief in which they insist that "the written consulting agreement about which Mr. Block testified" governs the relationship and forecloses the claim. (Def. Br. at 16–18.) Block testified that the document "contain[ed] the compensation terms" and the confidentiality provisions, and that, "[b]ased on my recollection of the agreement," it "governs the relationship." (Ex. 1 at 128:23-129:3, 132:3-7.) Barnes does not contend that this *testimony* is itself a memorandum satisfying the Statute, but rather that such testimony *supports the allegation* that a writing of such exists. What the agreement contains is a fact question that cannot be resolved against Barnes on the pleadings, least of all in Defendants' favor, when the document has never been produced and Block cannot find it. (*See id.* at 11:20-25, 132:24-133:2.) Defendants have not carried their burden of establishing the defense on the face of the pleading. Their own evidence is that a writing exists.

Finally, Defendants assert that Barnes "cannot escape the Statute of Frauds" because he "already conceded that his claim does not arise under the written contract." (Def. Br. at 11 (quoting ECF No. 118 at 9:12).) That is not what counsel said, as Point II.A explains.

## II. Plaintiff Has Adequately Pled a Breach of Contract Claim

"To state a claim in federal court for breach of contract under New York law, a complaint need only allege [i] the existence of an agreement, [ii] adequate performance of the contract by the plaintiff, [iii] breach of contract by the defendant, and [iv] damages." *Exch. Listing, LLC v. Inspira Techs., Ltd.*, 661 F. Supp. 3d 134, 144 (S.D.N.Y. 2023). The Amended Complaint pleads each.

### A) Plaintiff Adequately Pleads the Existence of a Contract

Barnes alleges a contract: Barnes avers that, to the extent his relationship with Defendants is not fiduciary, there is an agreement between them. (¶¶ 146–47.) Defendants' arguments fail. (Def. Br. at 7–9.)

*First*, Defendants argue four times that "[t]he entire basis for Plaintiff's new contract claim is Mr. Block's deposition testimony." (Def. Br. at 2, 7, 15, 18.) That is incorrect. Paragraph 142 incorporates every preceding allegation, and those allegations plead formation without reference to anything Block said in 2026. The pleading alleges, *inter alia*, a meeting in September 2011 at which the parties agreed on their arrangement (¶¶ 43, 45); the substance of those terms, expressly tied to the parties' prior practice (¶¶ 46–48); a handshake at the meeting's conclusion (¶ 51); and the parties' performance of the 50-50 profits-sharing that Defendants now dispute (¶¶ 52–68). Block's testimony is pleaded at ¶¶ 120–25 as *corroboration*. If you strip out Block's testimony, the claim stands on its own.

*Second*, Defendants' "cannot have it both ways" argument is foreclosed by Fed. R. Civ. P. 8(d). Defendants' assert that Barnes may not dispute Block's account of a written instrument while invoking Block's admission of assent. (Def. Br. at 17.) Defendants twice represent that Barnes' counsel admits there is no contract claim. (Def. Br. at 11, 17 (alluding to ECF No. 118).) But there was no concession before Magistrate Judge Ricardo; rather, Barnes' counsel clarified that Barnes' claim is "a legal theory in contract" and the core of the dispute is, "[Defendants] say it has certain terms; we say it has different terms." (ECF No. 118 at 9:9-19.) As Magistrate Judge Ricardo already found, Barnes' pleading a fiduciary duty claim does not foreclose a contract claim, or vice versa, because these are alternative theories. (*Id.* at 9:22-10:3 (answering the Court's inquiry, this was a "fallback theory" and "certainly an alternative theory"); ECF Nos. 115, 117.)

Barnes need not elect at the pleading phase; and Fed. R. Civ. P. 8(d)(2)-(3) states that "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically" and "[a] party may state as many separate claims or defenses as it has, regardless of consistency." This Court applied that rule to the original pleading, holding that "[p]articularly where, as here, there . . . [is a] dispute as to whether a valid contract exists, parties can and routinely do plead in the alternative." (ECF No. 41 at 13–14 (quoting *Burton v. iYogi, Inc.*, 2015 WL 4385665, at *11 (S.D.N.Y. Mar. 16, 2015)).) Defendants made the same argument against the unjust enrichment claim and lost. (ECF No. 41 at 14.) The argument fails here for the same reason.

*Third*, Defendants argument that Block's deposition testimony defeats the existence of a contract, (Def. Br. at 15–16), asserts an incorrect standard.[4] A document referenced in a complaint—here, the transcript of the Block deposition—may be considered "not for the truth of the matters asserted" but "only to determine" that the statements were made. *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007); *see Johnson v. Levy*, 812 F. Supp. 2d 167, 177 (E.D.N.Y. 2011) ("[N]ot only would it be reversible error for the Court to consider the deposition transcripts for the truth of the matter asserted, but it would be improper for the Court on a motion to dismiss to accept the statements in the deposition transcripts over the facts asserted in the complaint."). Defendants invoke the rule that "where a document relied on in the complaint contradicts allegations in the complaint, the document controls." (Def. Br. at 16 (quoting *Noriega v. Abbott Lab'ys*, 714 F. Supp. 3d 453, 457 (S.D.N.Y. 2024)).) But that rule is confined to instruments with legally operative terms

[4] Defendants also assert numerous facts that appear nowhere in the Amended Complaint, several flagged with the parenthetical "nor can he based on the discovery record." (Def. Br. at 5–7.) They tell the Court who "conceived, directed, and funded" the investigation, that Barnes joined "an existing team" including "an American full-time employee of Muddy Waters," that five additional reports issued between 2011 and 2013, that Barnes took a position with a competitor, and more. (*Id.* at 4–7.) Those are summary judgment contentions in the costume of pleading arguments, and the Court should disregard them.

whose content, *e.g.,* contracts or regulatory filings, is not subject to reasonable dispute. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153–54 (2d Cir. 2002) (contracts); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (qualifying the rule with "[i]t must also be clear that there exist no material disputed issues of fact regarding the relevance of the document"). Indeed, the court in Defendant's cited case, *Noriega*, ultimately rejected the argument that studies conducted by defendants, incorporated into the complaint and contrary to the allegations within, merited dismissal. 714 F. Supp. 3d at 458. Here, Defendants' argument reduces to the proposition that because Block testified there was no proceeds-sharing term, the Court must find as a matter of law that none existed. But Block's contested account of a fifteen-year-old conversation is subject to substantial dispute and the very issue in this litigation. It is not resolvable on a motion to dismiss.

Merely hypothetically, under Defendants' incorporation-by-reference theory, the Court would need to properly consider the *entirety* of that transcript—and not just the five excerpts of counsel's choosing. On that basis, the Court would also need to consider Defendants' admissions that "there was assent walking out of that meeting" (Ex. 1 at 156:11-13); that "[a]t the time there was an agreement, and we probably shook hands[]" (*id.* at 156:18-24); that "the material terms were discussed at that meeting[]" (*id.* at 123:11-14); and Block had "[z]ero indication . . . at the time[] that [Block] and Mr. Barnes didn't have the same understanding as to the terms of the relationship[.]" (*Id.* at 157:3-7.) Block did not dispute that there was "some working relationship" between the parties, only "the nature of that working relationship." (*Id.* at 10:9-16.) These allegations support an agreement *as a matter of law*.

At bottom, Defendants' assertions suggest a disagreement as to the terms of an agreement. But Barnes amply alleges the existence of an agreement. *See, e.g., Exch. Listing, LLC*, 661 F.

Supp. 3d at 151–52 (denying Rule 12(b)(6) motion to dismiss a breach of oral contract claim where "Defendants' stated bases for dismissal of the breach of the [o]ral [c]ontract claim rest on Defendants' own characterization of the operation of the [o]ral [c]ontract . . . rather than the allegations in the Complaint.")

**B) Plaintiff Pleads With Definiteness the Essential Terms of the Contract**

Defendants argue that the contract claim, as plead, is "vague and indefinite[.]" (Def. Br. at 18.) This is wrong. The definiteness doctrine is "necessarily flexible, varying . . . with the subject of the agreement, its complexity, the purpose for which the contract was made, the circumstances under which it was made, and the relation of the parties." *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 482–83 (1989). Before rejecting an agreement as indefinite, "a court must be satisfied that the agreement cannot be rendered reasonably certain by reference to an extrinsic standard that makes its meaning clear." *Id.* at 483. A compensation term is not indefinite merely because no figure or formula is stated, so long as the amount "can be determined objectively without the need for new expressions by the parties" including "by reference to an extrinsic event, commercial practice or trade usage[.]" *Id.* Courts "will not apply the doctrine of indefiniteness to 'defeat the reasonable expectations of the parties in entering into the contract[.]'" *Kramer v. Greene*, 142 A.D.3d 438, 439 (1st Dep't 2016).

Barnes amply pleads the terms of the parties' agreement: Barnes would perform work without upfront compensation; that each party would trade for his own account; and that, if the project were to yield proceeds through monetization of research, Barnes would be entitled to equal split of net revenues. (¶ 40.) This alone is sufficient for a contract claim. *Rackson v. Sosin*, 2001 WL 266981, at *1–2 (2d Cir. Mar. 16, 2001) (defendant's "definiteness argument fails since the amount of bonus compensation in this case is determinable by reference to extrinsic events", the

parties had a prior course of conduct, and the agreement provided for compensation based on work solicited).

The parties' course of dealing supplements the terms Defendants say are missing. Here, Barnes pleads a prior course of dealing on numerous research projects over the course of 2011 wherein and the parties had a settled arrangement under which they alternated bearing report costs, each traded at his own risk, and, as to third-party sales, "had agreed that, if that were to occur, they would share in the net revenues from such transaction" (¶¶ 40, 33–41.)

On materially identical allegations the First Department reversed a dismissal in *Law Offices of K.C. Okoli, P.C. v. Maduegbuna*, holding that a complaint alleging that the defendants had previously paid a set percentage in previous matters, and that the agreement called for division "as the parties 'had done in the past,'" pleaded a course of dealing sufficient to establish the terms of a fee-sharing agreement. 62 A.D.3d 477, 478 (1st Dep't 2009); *accord Basu v. Alphabet Mgmt. LLC*, 127 A.D.3d 450, 450 (1st Dep't 2015) (oral agreement not indefinite as a matter of law where "there may exist an objective method for supplying the missing terms"); *Muhlstock v. Cole*, 245 A.D.2d 55, 58 (1st Dep't 1997) (unspecified duration did not render a profit-sharing arrangement unenforceable where course of dealing established the venture).

This pleading goes further than *Okoli*. It alleges not merely a prior practice but performance of the disputed term *on this project*. As this Court has previously noted, Block marketed the Focus Media research to a third-party investment fund, computed the net revenue after total project expenses, and remitted Barnes his share. (ECF No. 41 at 16 ("Indeed, Plaintiff alleges that, after the sale of the FMCN Report to a third party, Block 'remitted to Mr. Barnes his share of the net revenue, after total project expenses, from that sale.' (*Id.* ¶ 68.)").) Course of performance is probative of what contracting parties meant by their words, and answers Defendants' complaint

that the pleading contains no "contractual definition of the term 'monetization of the research.'" (Def. Br. at 8.) The parties defined it by doing it. The term is not, as Defendants say, "a bespoke term made up by Barnes with no accepted meaning anywhere in business law." (*Id.* at 19.)[5]

Finally, Defendants ask what Barnes' "split" was to be. (Def. Br. at 20.) Barnes has repeatedly stated that his agreement was for 50% of net revenues. (Exhibit 2 (Barnes Dep. Tr., dated May 6, 2026) at 22:6-7, 44:12-16, 317:10-16; ¶¶ 40, 46.) Where parties agree to share the proceeds of a joint undertaking without specifying shares, each shares equally. N.Y. P'ship Law § 40(1); *see also Edwin v. Arackal*, 241 A.D.2d 335, 335 (1st Dep't 1997); *Johnson v. Spence*, 286 A.D.2d 481, 482–83 (2d Dep't 2001) (plaintiff alleging an oral agreement to share proceeds equally "was not required to make an evidentiary showing in support" on a motion to dismiss).

Finally, Defendants list eight items they say Barnes was required to plead: the species of contract, the parties, his precise obligations, each of Defendants' obligations, terminability, timing, amount, and the meaning of "monetization" and assert that "[o]mitting any one of these terms would be fatal to Plaintiff's claim." (Def. Br. at 19.) No authority supports that proposition, and it collides with Fed. R. Civ. P. 8(a) notice pleading. While several items on the list are in the pleading in any event, including the parties (¶ 144), Barnes' obligations (¶¶ 46–47), Defendants' obligations (¶¶ 46, 48), and the compensation formula (¶¶ 40, 68), the substantive requirement that an

[5] Defendants authorities are inapposite. *Charles Hyman, Inc. v. Olsen Indus., Inc.* is a post-trial case involving an alleged agreement to merge two construction businesses where the parties had spent two years constantly revising their allocation of tasks and compensation, written agreements contradicted the alleged oral one, and the trial court found both principals incredible. 227 A.D.2d 270, 275–76 (1st Dep't 1996). *Hecht v. Helmsley-Spear, Inc.* dismissed a claim that specified no "amount, form, [or] timing of payment" and identified "no methodology or custom providing for the determination of the same[.]" 65 A.D.3d 951, 951 (1st Dep't 2009). Here there is a methodology and a custom: net revenue after expenses, shared. This the formula Block himself applied. (¶ 68.)

enforceable contract have reasonably certain material terms is not a pleading rule demanding a term-by-term recitation at the complaint stage. *See Johnson*, 286 A.D.2d at 482.

**i. Plaintiff Adequately Pleads That He Performed**

Defendants attack ¶ 147 in isolation and attempt to label Barnes' pleading of performance conclusory. (Def. Br. at 21.) But ¶ 142 incorporates the preceding 141 paragraphs, which describe Barnes' performance in detail: due diligence for the report (¶ 52); population of the encrypted data room with source materials (¶ 53); travel to Bangkok in October 2011 to conduct boots-on-the-ground research (¶¶ 54–55); identification of the Allyes self-dealing transactions (¶ 57); work performed under a cyberattack and against the background of credible threats of violence against a colleague on a related matter (¶ 58); a month in Thailand followed by weeks working from Block's residence (¶¶ 59–60); authorship of the 80-page report (¶ 61); and preparation and execution of the coordinated distribution of the report (¶¶ 62–67).

*Spencer-Smith v. Ehrlich*, is directly on point and distinguishes both cases Defendants rely on. 347 F.R.D. 606 (S.D.N.Y. 2024). A general allegation of performance suffices where the complaint makes a positive allegation of performance under the contract at issue, identifies the defendant's obligations, and pleads facts establishing non-performance and the plaintiff "need not identify all of her obligations under the agreement and allege . . . satisf[action of] each of them," because the defendant, as counterparty, is positioned to contest performance. *Id.* at 617–18. The plaintiff in *Swan Media Grp., Inc. v. Staub* failed because the plaintiff identified no breached clause and the contract was arguably void for vagueness. (Def. Br. at 21 (citing 841 F. Supp. 2d 804, 808 (S.D.N.Y. 2012)).) The plaintiff in *Boustead Sec., LLC v. Leaping Grp. Co., Ltd.* failed because the plaintiff was party to two agreements and never alleged performance under the one it sued on. (Def. Br. at 21 (citing 2021 WL 3774116, at *3 (S.D.N.Y. Aug. 25, 2021)).) Neither defect exists

here. *Cf. Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 356–60 (S.D.N.Y. 2012) (specific allegations of what the plaintiff did was enough to plead performance).

Defendants also fault Barnes for not alleging "what obligations he had to satisfy to trigger Defendants' purported obligation to pay him." (Def. Br. at 22.) The pleading answers that: he was to conduct the research and analysis (¶¶ 46–47), permit publication under the Muddy Waters name (¶ 48), and maintain the confidentiality regime Block imposed (¶¶ 49–50). He did all three.

**ii. Plaintiff Adequately Pleads that Defendants Breached the Contract**

Paragraph 148 alleges that Block received a $14 million whistleblower award and failed to remit Barnes' portion. Defendants respond that Barnes "never alleges that there was a meeting of the minds that a whistleblower award would constitute 'monetization of the research.'" (Def. Br. at 22.) Whether a particular receipt falls within a contractual category is a question of contract interpretation, resolved on evidence of the parties' words, their course of dealing, and their course of performance. It is not an element of the claim, and it is not resolvable now. *See Novartis Pharma AG v. Incyte Corp.*, 520 F. Supp. 3d 514, 532 (S.D.N.Y. 2021) (holding claim to patent was ambiguous under the agreement and not resolvable on motion to dismiss).

Defendants also argue that Barnes' "theory that the whistleblower award was a monetization of his research has already been rejected" by the SEC's awards to Block (and not to Barnes) and upheld. (Def. Br. at 22.) But neither the SEC nor the Third Circuit decided this question of a private agreement between Barnes and Defendants, and Barnes is free to bring this claim here. Collateral estoppel requires that "the issue must have been material . . . and essential to the decision rendered" in the prior proceeding, and that the party against whom it is invoked have had a full and fair opportunity to litigate it. *Ryan v. N.Y. Tel. Co.*, 62 N.Y.2d 494, 500–01 (1984). The SEC decided who was statutorily eligible for an award *from the SEC* and in what amount, and the Third Circuit reviewed that determination. *Doe*, 2023 WL 3562977, at *2–3.

Neither tribunal was asked to decide whether Block had privately agreed to share proceeds of any award with Barnes, and neither had occasion to. Furthermore, those proceedings were not adversarial as between these parties on any contract question. A holding that Barnes did not himself qualify as a whistleblower says nothing about whether Block promised him a share of what Block received.

Defendants' final contention is that "[a]fter the FMCN Report was published, there was no research left to sell." (Def. Br. at 23.) That is a merits argument, and it is contradicted by ¶ 68 and by Block's own testimony that the sums he paid Barnes "in connection with" the third-party transaction were not among the project costs he reported to the SEC (Ex. 1 at 279:13-17) and that he tallied project costs on a spreadsheet to send to the fund "post November 21st." (Ex. 3 (Block Dep. Tr., dated May 14, 2026) at 94:8-13.) Whatever the ultimate answer, it is not one the Court can reach on a motion addressed to the pleading.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Fourth Cause of Action should be denied.

Dated: September 25, 2026
New York, NY

SLARSKEY LLC

By:______________________________

Evan Fried
Nicole Santoro
Phillip Gasperretti
825 Third Ave., 32nd Floor
New York, NY 10022
(212) 658-0661
*Counsel for Plaintiff Kevin Barnes*

**CERTIFICATION**

I HEREBY CERTIFY that, pursuant to this Court's Individual Rules and Practices in Civil Cases, § 2(h), the instant Memorandum of Law complies with Local Civil Rule 7.1(c). This Memorandum contains 8,072 words, exclusive of the case caption, table of contents, table of authorities, signature blocks, and required certificates.

Dated: September 25, 2026
New York, NY

SLARSKEY LLC

By:________________________________

Evan Fried
Nicole Santoro
Phillip Gasperretti
825 Third Ave., 32nd Floor
New York, NY 10022
(212) 658-0661
*Counsel for Plaintiff Kevin Barnes*