# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Case No. 22-cv-7236(LTS)(HJR)

- - - - - - - - - - - - - - - - - - -x

KEVIN BARNES, :

Plaintiff, :

- vs - :

CARSON BLOCK and MUDDY WATERS, LLC,:

Defendants. :

- - - - - - - - - - - - - - - - - - -x

May 12, 2026
9:37 a.m.
767 Third Avenue
New York, NY

VIDEOTAPED AND REMOTE DEPOSITION UPON ORAL EXAMINATION OF CARSON BLOCK, held at the above-mentioned time and place, before Randi Friedman, a Registered Professional Reporter, within and for the State of New York.

APPEARANCES:

SLARSKEY LLC
Attorneys for Plaintiff

767 Third Avenue, 14th Floor
New York, New York 10017
BY: EVAN FRIED, ESQ.
NICOLE SANTORO, ESQ.

EMERY CELLI BRINCKERHOFF ABADY
WARD & MAAZEL, LLP
Attorneys for Defendants

One Rockefeller Plaza, 8th Floor
New York, New York 10020
BY: ANDREW CELLI, ESQ.
SAM SHAPIRO, ESQ.
ADAM NASSAR, ESQ.

* * *

ALSO PRESENT:

Charlie Bowman - Videographer
John Summers, Esq.
Michael J. Masciandaro, Esq.
Elena Roberts, Esq. - (Zoom)
Brooklyn Hollander - (Zoom)
Kevin Barnes - (Zoom)

* * *

STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED, by and among counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.

* * *

C. Block

for his work; correct?

MR. CELLI: Objection to the form.

THE WITNESS: Mr. Barnes had his expenses reimbursed and he had the opportunity to trade on the Focus Media report.

BY MR. FRIED:

Q There's no dispute that there was some working relationship between Mr. Barnes and you; correct?

A That's correct.

Q You just dispute the nature of that working relationship; right?

MR. CELLI: Objection.

THE WITNESS: That's correct.

BY MR. FRIED:

Q How do you describe the relationship between Mr. Barnes and defendants with respect to Focus Media?

A So Kevin Barnes was a contractor or a consultant. I considered him to be a primary researcher. So in Bangkok there were five primary researchers who were working on that full time, and so he along with the other primary

C. Block

met, yes.

Q Okay. Did the subject of Mr. Barnes contributing capital, was that subject discussed at all?

MR. CELLI: Objection to the form.

You can answer.

THE WITNESS: We did not discuss him taking money from his pocket or his account and putting it into our vehicle or our -- yeah, our pooled fund. We did not discuss that.

BY MR. FRIED:

Q Okay. Did you discuss, in sum or substance, that if Mr. Barnes were to contribute capital, it would be to an offshore entity?

A We did not discuss Mr. Barnes contributing capital.

Q Did you tell Mr. Barnes, in sum or substance, that there was an offshore entity that you co-manage with Mr. Malnik?

A I don't recall whether I described it as an entity, but I believe that we stated that we pooled our money together, and that Dov traded it on behalf of people who had contributed money.

C. Block

Q Okay. So you discussed that there was an offshore pool that you and Mr. Malnik had a hand in; correct?

A I don't know whether he described it as offshore, but, yes, we --

Q Okay.

A -- we made clear to Kevin that most of the team members had money in this pool.

Q But you didn't ask Mr. Barnes to contribute to this entity?

A No. We offered to lend money into the pool that would be treated as his if he joined the project. However, the principal would have to be repaid. But if there were a loss, it would be non-recourse and he would not have to recompense us for the loss.

So in other words, we offered to assign him some portion of the interest from Dov, mine, Tomer's trading interests for purposes of the Sino-Forest project.

Q Okay. Did you ever at any point in time have an offshore entity that you co-owned with Mr. Malnik?

A Yes.

C. Block

Q Did you ever have an offshore trading account with Mr. Malnik?

A Not in his name, no.

Q In an entity name?

A No, I don't believe so.

Q 2011, did you personally contribute to an account that you and Mr. Malnik had an interest in?

A Do you -- please explain that.

Q If you know.

A I'm asking if you would explain it, so --

MR. FRIED: Can you repeat the question?

(Whereupon the reporter read back the requested portion of the record.)

THE WITNESS: Okay. Define "interest."

BY MR. FRIED:

Q In 2011 did you personally contribute money to an account that Mr. Malnik had trade execution authority over?

A Yes.

Q Did you tell Mr. Barnes, in sum or

C. Block

that this was one of those occasions on
which Dov wanted to repeat the things that
we both thought he should make clear.

BY MR. FRIED:

Q What are those things that Mr. Malnik indicated he wanted to make clear to Mr. Barnes?

A Ever since the meeting in Hong Kong, we were concerned about whether Kevin could be trusted to keep a project confidential. So Dov was repeatedly telling Kevin, hey, remember, this is completely confidential. I preferred Dov do that, because I was the one who was going to instruct Kevin, so it was kind of good cop/bad cop on that.

Q Fast-forward years later, Mr. Block, in fact, Mr. Malnik couldn't be trusted; right?

MR. CELLI: Objection to the form.

THE WITNESS: It turns out that in my view, neither of them were to have been trusted. Just Dov was better at concealing that than Kevin was.

BY MR. FRIED:

Q Mr. Barnes asks, "Let me know if he has any location preferences." You ultimately

C. Block

respond the next morning, "InterContinental Barclays"; do you see that?

A Yes.

Q What did you do with Mr. Malnik to prepare for the meeting with Mr. Barnes?

MR. CELLI: Objection to the form.

THE WITNESS: I don't know. I don't recall that we had to prepare, other than quick discussion.

BY MR. FRIED:

Q Did you have any -- do you have any specific recollection of there being discussion between you and Mr. Malnik preparing for this meeting that was contained in the emails?

A I don't recall anything in email.

Q Did you discuss verbally or in email who would speak on both of your behalfs?

A Well I don't think we planned for a single speaker. It was three people at the meeting. We tend to make employees interactive among all the parties.

Q Why did you want to meet with Mr. Barnes in person?

A I don't recall with specificity, but I

C. Block

I don't think we discussed that he actually wanted two rental trip airfares instead of one. I don't believe that was discussed at the meeting. That was a later item, which was fine.

Made clear that there was no fixed payment, you know, that would basically -- we made clear that his prior counter-proposal on Sino-Forest was not being entertained. So I think the material term -- and, again, the confidentiality, so the material terms were discussed at that meeting.

BY MR. FRIED:

Q You said you made clear that there would be no stipend or fixed fee, project fee as he had proposed for Sino-Forest; right?

A That's correct.

Q And you said that --

A And we -- I did -- I believe I discussed that he could get a discretionary bonus, depending on how the economics worked. So -- and it's depending on my level of satisfaction of his work. So a bonus amount that

not really material.

Q But you agree that if this agreement exists, it governs the relationship?

MR. CELLI: Objection to the form.

THE WITNESS: Based on my recollection of the agreement, yes.

BY MR. FRIED:

Q Did you disclose the existence of the supposed agreement in your Rule 26(a) disclosures?

MR. CELLI: You want to show him something on that, Evan?

MR. FRIED: I'm just asking if he remembers.

THE WITNESS: I mean, you want to ask my lawyers? I don't --

BY MR. FRIED:

Q I'm asking if you have a specific recollection of disclosing the existence of this supposed agreement in your 26(a) disclosures?

A I don't recall my 26(a) disclosures because counsel does them for me. So -- but because I'm unable to find the agreement, I don't -- I don't know that it would be disclosed

C. Block

in the 26(a) disclosures.

Q Did you disclose the belief or belief of this supposed agreement to Mr. Barnes in this litigation prior to today?

A He and I have not -- well, I have not spoken with him in probably at least 10, 12 years.

Q Since this litigation began, what did you do to look for this supposed agreement?

A Well with the computers that I could get open, I gave -- I gave the passwords, the email passwords to the firm that do the electronic discovery. I had my wife search her machines that she had access to. Looked through written files. Yeah, and just -- you know, unfortunately given the passage of time and the diffusion of information at that point in time in 2011, I have not come up with these -- or with this.

Q Setting aside the searches you did for documents generally for this litigation, did you conduct a specific search specifically for this supposed written agreement?

A Well I mean -- you know, I've searched

C. Block

Barnes. I've searched for agreements that I had -- I mean, I don't -- effectively, I think almost everything that I have and been able to produce is in my Gmail. So if it's not in Gmail, and my wife had a few straggler documents, that's substantially everything that survives today.

Q Without telling me what was said, when was the first time you told your attorney your belief that this supposed agreement existed?

MR. CELLI: I'm going to object and instruct you not to answer.

THE WITNESS: Isn't that privileged? Okay.

MR. CELLI: You're not going to answer that question.

BY MR. FRIED:

Q Are you aware of any written agreement with Mr. Barnes terminating this supposed written agreement from 2011?

A No.

Q When we finished this morning, we were talking about the meeting between you and Mr. Barnes and Mr. Malnik in the InterContinental Barclays.

C. Block

Q You have a specific recollection --
A So we always -- I always termed the bonuses as discretionary. That was something that I was very careful about doing when I entered into agreements with consultants or employees.
Q Written agreements; right?
A Written and oral.
Q Okay. So just let's get this right.
At the meeting at the InterContinental, you have a specific recollection of using the term "discretionary"?
MR. CELLI: Objection to the.
THE WITNESS: No. I have a recollection of when I would discuss bonuses, people who are potentially consultants or employees, making clear that those were always discretionary bonuses.
BY MR. FRIED:
Q So you have a general recollection or you have a general practice of using the term "discretionary," but you don't have a specific recollection of using that term in the meeting with Mr. Barnes in the InterContinental?

C. Block

A That is correct.

Q Did you discuss the SEC whistleblower program at the meeting at the InterContinental Hotel in September of 2011?

A I do not believe that we did. I do not recall any discussion of that.

Q Did the word "partner" or "partnership" come up at the meeting at the InterContinental hotel?

A That, I think I would remember if he were discussing in substance a partnership, and it did not come up.

Q You said you would remember it, but do you have a specific recollection one way or another?

A No, which tells me it did not come up. See, important discussions, like you're taking on a partner, those I remember. Otherwise, Mr. Barnes was one of umpteen analysts I've employed as actual employees or consultants over the years. So that sort of thing, that's not -- that's not the kind of discussion where 15 years later, you remember every detail. But the partnership ones stick in your mind much more so,

C. Block

or other significant business decisions.

Q Did you ever tell Mr. Barnes at this meeting that there was no partnership on the table?

A Well because there was no partnership on the table, I did not say there was no partnership on the table.

Q There was no --

A There was no sports car on the table. There was no house on the table. There was no partnership on the table, so I did not say any of those things were not on the table.

Q Your specific recollection is that the term "partner" or "partnership" never came up in this meeting; right?

A That's what I'm telling you, yes.

Q And you know Mr. Barnes disagrees with you on this; right?

MR. CELLI: Objection to the form.

THE WITNESS: And you know that I'm not sure in his heart of heart disagrees, but he's claiming otherwise.

BY MR. FRIED:

Q He said one thing. You've said the

C. Block

partner of mine, I did believe that there had been assent. Actually, let me rephrase that.

There was assent to his role as a consultant, a primary researcher, and effectively a junior person on the team. There was no assent to him being a partner, whether in title or in substance.

BY MR. FRIED:

Q From your perspective, there was assent walking out of that meeting; right?

A Yes.

Q The parties just disagree as to what that assent covered; right?

A Years later there was a agreement. At the time, I don't think so.

Q At the time, there was a handshake agreement; right?

MR. CELLI: Objection to the form.

THE WITNESS: At the time there was an agreement, and we probably shook hands, but as I told you, I do believe that I documented the actual agreement.

C. Block

BY MR. FRIED:

Q Did you have any indication at the time, that you and Mr. Barnes didn't have the same understanding as to the terms of the relationship?

A Zero indication.

Q I recently saw in another litigation that you referred to Mr. Barnes as "contract employee."

What do you mean by that?

A Would you provide me with the source material?

Q I don't have it on me.

Did you ever refer to Mr. Barnes as a contract employee?

A I don't even know what litigation you're referencing.

Q It's the Texas thing that these guys represent you in as well.

Is it your words or is it the lawyers' words?

A TTI?

Q Yeah.

A Oh, because he popped in on the Zoom

C. Block

call, I guess. That's the lawyers' words.

Q Lawyers' words?

A Yes.

Q Okay. Have you ever used the term "contract employee" personally?

A "Contractor" quite possibly. "Contract employee," no.

Q Okay.

A Yeah, I -- I basically outsourced that, you know, litigation to my general counsel and outside counsel.

Q I think you said earlier that from your perspective, the compensation or consideration to Mr. Barnes included reimbursement for travel; right?

A Or advanced payment of travel or direct payment of travel, so travel expenses.

Q He had the opportunity to trade the Focus Media security and he had a discretionary bonus; right?

A He was eligible for a discretionary bonus.

Q Eligible, okay.

Did any of Mr. Barnes' compensation

C. Block

include a salary or stipend?
A No.
Q Was Mr. Barnes entitled to any paid time off?
A Well he was not an employee. He took -- he went back to the States for a wedding, which I agreed to in advance. But because he's not drawing a salary or receiving a stipend, I wouldn't call that "paid time off."
Q Was there an hourly rate associated with Mr. Barnes' work?
A No, other than what I pay my lawyers.
MR. CELLI: Give me one second.
THE WITNESS: That was humor, I'd like to clarify for the record. That was sarcasm/humor.
MR. CELLI: Yeah.
MR. FRIED: I'll stipulate to that.
THE WITNESS: There you go.
BY MR. FRIED:
Q Did the terms of what you agreed to at the meeting at the InterContinental in September of 2011, extend to other opportunities outside of

C. Block

declaration that your work on Focus Media was also influenced by the fact that Muddy Waters intended to monetize the research with Oasis; right?

MR. CELLI: Objection to the form.

THE WITNESS: I'll take your word for it.

BY MR. FRIED:

Q You say, "My research and investigation took four months to complete and cost more than $300,000.00."

Does the 300,000-dollar figure you included, include the amounts you paid to Mr. Barnes in connection with the Oasis transaction?

A No.

MR. CELLI: Objection to the form.

THE WITNESS: I don't think so.

BY MR. FRIED:

Q Okay. You didn't tell the SEC that some of the people on the team, including Mr. Barnes, worked on a contingent basis; right?

MR. CELLI: Objection.

THE WITNESS: I'll take your --

C E R T I F I C A T I O N

I, Randi Friedman, Registered Professional Reporter and Notary Public of the State of New York, do hereby certify:

THAT, the witness whose testimony is herein before set forth, was duly sworn by me, and THAT, the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related either by blood or marriage to any of the parties to this action; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this day, May 26, 2026.

Randi Friedman, RPR

KEVIN BARNES vs. CARSON BLOCK, et al.
5/12/2026 - CARSON BLOCK

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE___________________________
_______________________________________________________
REASON_________________________________________________
PAGE_____ LINE_____ CHANGE___________________________
_______________________________________________________
REASON_________________________________________________
PAGE_____ LINE_____ CHANGE___________________________
_______________________________________________________
REASON_________________________________________________
PAGE_____ LINE_____ CHANGE___________________________
_______________________________________________________
REASON_________________________________________________
PAGE_____ LINE_____ CHANGE___________________________
_______________________________________________________
REASON_________________________________________________
PAGE_____ LINE_____ CHANGE___________________________
_______________________________________________________
REASON_________________________________________________

________________________________   _____________
CARSON BLOCK                        Date

KEVIN BARNES vs. CARSON BLOCK, et al.
5/12/2026 - CARSON BLOCK

ACKNOWLEDGEMENT OF DEPONENT

I, CARSON BLOCK, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted on the Errata to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ _______________

CARSON BLOCK Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

______ DAY OF ________________, 20___.

__________________________

NOTARY PUBLIC